IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | CASE NO.:  1:14-CR-290-TWT-GGB |
| v. | : | |
| | : | |
| | : | |
| OSCAR JAMESON STOKES, MD, | : | |
| | : | |
| Defendant. | : | |

**DEFENDANT OSCAR JAMESON STOKES' POST-HEARING BRIEF
IN SUPPORT OF MOTION TO SUPPRESS**

Pursuant to Rule 41(h) of the Federal Rules of Criminal Procedure,

Defendant Dr. Oscar Jameson Stokes ("Dr. Stokes") hereby files this post-hearing

brief in support of his previously filed Motion to Suppress Evidence Obtained by

the Government's Source of Information (Doc. 30) and subsequently filed

memorandums (Doc. 36 & Doc. 47).

STATEMENT OF FACTS

As the Court is aware, the Government has alleged in the superseding

indictment that between March 2013 and August 2014 Dr. Stokes operated a

medical clinic, Innovative Pain Management Clinic, for the purpose of distributing

controlled substances outside the course of medical practice and not for a

legitimate medical purpose (Doc. 55).

The Government produced discovery to the defense showing that a confidential source and a source of information obtained video footage and photographs from inside Dr. Stokes' medical clinic. The motion currently before the Court seeks to suppress the video recordings obtained by the Government's confidential source as well as the photographs obtained by the Government's source of information.

The Court held an evidentiary hearing on May 13, 2016, November 10, 2016, and December 16, 2016, at which time the Government presented the Confidential Source (Tameka Stokes), the Source of Information (Cheryl Thomas), and three law enforcement officers (William Manning, Geoffrey Furman, and Scott Nesbitt) as witnesses.

A. <u>Confidential Source</u>

Tameka Stokes ("the Confidential Source") testified that she was hired by Dr. Stokes in March of 2014 to work in his medical clinic as a medical assistant (Doc. 99 – 154, 156, 209). She testified that her job day-to-day duties consisted of taking the "*[patients] blood pressure… asked them about their pain level, and then we filled out the prescriptions, and either had Dr. Stokes or – either Dr. Stokes sign, and then we gave them their prescriptions and their next appointment.*" (Doc. 99 – 158). She explained that all patient files were on AthenaNet, an electronic storage system, and that she had her own login for AthenaNet (Doc. 99 –

159). She further testified that she held many positions at the clinic: "*I worked the telephones, I worked the front desk, I've assisted Oscar in procedures, I've worked his equipment while he was doing the procedures...*" (Doc. 99 – 162).

She claimed that she had access to "*[t]he whole building*," but that at one point Dr. Stokes started "*changing up everything... not just how we interacted with patients but how we interacted with each other... [h]e didn't want us talking to one another.*" (Doc. 99 – 167). She stated that in mid or late July Dr. Stokes "*started assigning us to the exam rooms, so that's where we sat and then the patients came to us.*" (Doc. 99 – 167-68). She testified that she had a key for the clinic that opened up every door "*except for both Dr. Stokes' offices.*" (Doc. 99 – 169).

The Confidential Source testified that she attempted to contact the DEA at least twice in May of 2014 (Doc. 99 – 171). She then contacted the local news and thereafter received a call from a local law enforcement officer who put her in touch with Special Agent Scott Nesbitt of the DEA (Doc. 99 – 171-72). She had a conversation over the phone with Special Agent Nesbitt on July 23, 2014 (Doc. 99 – 172) (Doc. 105 – 290). The Confidential Source testified that she then met with Special Agent Nesbitt in person on July 24, 2014, and that at this meeting Special Agent Nesbitt asked her about her employment and whether she could "*get things on recording.*" (Doc. 99 – 173) (Doc. 105 – 290). She testified that she "*agreed to wear a wire and to... testify*" (Doc. 99 – 175), and that she signed a Confidential

Source Agreement with the DEA (Doc. 105 – 246) (Defendant's Exhibit 1). She explained the purpose of wearing a recording device was to get Dr. Stokes on tape, but that the DEA never discussed any limits on what she could do as a confidential source (Doc. 105 – 248-52). She testified that the DEA was aware that she would be recording patient files, prescriptions, and *every part of the company*." (Doc. 105 – 250-51).

The Confidential Source testified that on July 25, 2014 she met with DEA agents at a fast food restaurant, and that the DEA instructed her on how to use a covert recording device (Doc. 99 – 177, 225) (Doc. 105 – 290). She explained that over the course of three days, beginning on July 25, 2014, she went to work and made recordings of prescriptions, documents from a patient's file, prescriptions being signed by Dr. Stokes and Dr. Tashawna Stokes, and Dr. Stokes conducting a medical exam on a new patient (Doc. 99 – 181-90) (Doc. 105 – 308) (Government's Exhibits 2-4). She testified that these recordings were made while she was conducting her daily work routine (Doc. 99 – 191).

The Confidential Source agreed that at the time she made the recordings Dr. Stokes did not want "*the employees communicating with one another*" about patients or anything else, that the employees were "*assigned to their own rooms*," and that "*we wasn't moving around like we usually do*." (Doc. 105 – 256-57). With regard to HIPAA, the Confidential Source testified: "*With HIPAA is that it's*

4

*medical information that is not supposed to be shared, talked about. What's in those files is there in those files, it's confidential.*"  (Doc. 99 – 219).

Special Agent Nesbitt testified that "*we had a discussion that she would be in the regular course of her job*" while recording, and that "*we said you're not going to do anything beyond what you normally do.*" (Doc. 105 – 325). He also testified that the CS had made the representation that "*she had access to the whole clinic.*" (Doc. 105 – 325).   Regarding HIPAA, Special Agent Nesbit testified: "*My understanding is HIPAA doesn't apply to law enforcement stuff when it involves investigations, so I don't know that would have come up.*" (Doc. 105 – 379). Regarding Georgia surveillance law, Special Agent Nesbitt testified: "*I would never inform somebody specifically about Georgia law when we're doing this.*" (Doc. 105 – 380).

Special Agent Geoffrey Furman of the DEA testified that the Confidential Source was "*acting under my direction*" on July 25, 2014 (Doc. 99 – 124, 132), but that Special Agent Nesbitt was the "*controlling officer.*" (Doc. 99 – 134).  He testified that he "*directed this confidential source to go to – into the clinic for their normal working day activities, and to attempt to record any kind of – what was determined or believed to be illicit activity at that time.*" (Doc. 99 – 125).  He further testified that he did not know what the Confidential Source's duties were at the medical clinic at the time the recordings were made (Doc. 99 – 131-32).

B. <u>Source of Information</u>

Cheryl Thomas ("the Source of Information") testified that she started working for Dr. Stokes at his medical clinic in June of 2013, and that her job duties consisted of collecting and screening urine for drugs (Doc. 107 – 9-11, 43). She explained that a bathroom was connected to her lab, and that patients would provide specimens through a door (Doc. 107 – 11-13). She explained that the medical clinic initially did all testing on-site, but that the medical clinic evolved into using a confirmation company to confirm its test results (Doc. 107 – 14-15). The Source of Information explained that she was eventually employed both by Dr. Stokes and the confirmation companies (Doc. 107 – 14-15).

The Source of Information testified that she would hand Dr. Stokes lab results or place the results on his desk (Doc. 107 – 16-17). She testified that she mostly stayed in the clinic's lab: "*I would venture out sometimes and speak to people, but most of the time, the volume was so much that I – it would warrant me not even leaving the room.*" (Doc. 107 – 19). She testified that she had a key for the lab which also opened the main door to the clinic and storage closets (Doc. 107 – 20-21). She testified that she had "*access to patients' files*" but that she never made any entries in the patients' files (Doc. 107 – 21). She explained that she would login to AthenaNet and "*I would print out their insurance information… for billing purposes.*" (Doc. 107 – 21). She explained that she was never in the exam

6

rooms with the patients (Doc. 107 – 50). She testified that Dr. Stokes employed a variety health care professionals including an RN, physical therapist, medical assistants, receptionists, and "*data entry people*." (Doc. 107 – 43, 56).

The Source of Information testified that she called the DEA hotline and received a call back from a law enforcement officer who asked to meet with her (Doc. 107 – 23). She testified that sometime thereafter she met with Special Agent Nesbitt and Task Force Officer William Manning at a Starbucks, and that she expressed her concerns about the clinic's practices at the meeting (Doc. 107 – 24-25). She testified that there were not any discussions at the meeting of how she could help the DEA, and that one of the officers gave her his business card (Doc. 107 – 59-62). She testified that the officers stated that, "*they would pass [her information] to someone that would get in touch with me*." (Doc. 107 – 104). She explained that she later exchanged the following text messages with TFO Manning:

- The Source of Information sent a text message to TFO Manning on July 22, 2014 stating: "*Chart after chart, no medical records, no x-rays. Just come in, pay $500 and get meds*." She testified that she also attached a photograph she had taken of a patient's electronic medical record from AthenaNet (Doc. 107 – 27-28) (Government's Exhibit 1A).

7

- The Source of Information sent a text message to TFO Manning on July 24, 2014 stating: "*I believe today, tomorrow and next Thursday and Friday will probably be the last time Dr. Tashawna Stokes will be forging scripts.  He interviewed a doctor that will start in August.*" (Doc. 107 – 29)(Government's Exhibit 1B).

- TFO Manning responded on July 24, 2014 by stating: "*Do you know the name.*" TFO Manning also responded: "*Maybe Carlos Tan?*" (Government's Exhibit 1B).

- The Source of Information responded on July 24, 2014 by stating: "*I can't be sure, I just heard him pronounce his name, he mentioned that he's a surgeon also, his CV on his desk, but they locked the door, I'll try to take a pic sometime today.*" (Government's Exhibit 1B).

- TFO Manning responded on July 24, 2014 by stating: "*Nothing risky.*" (Government's Exhibit 1B).

- The Source of Information responded on July 24, 2014 by stating: "*Ok*" followed by: "*Yeah you're right.  I'll just wait, he will be here Sat at 1pm, I work every Sat, I'll find out then.*" (Government's Exhibit 1B).

- TFO Manning responded on July 24, 2014 by stating: "*Ok.*" (Government's Exhibit 1B).

- The Source of Information sent TFO Manning a photograph of a CV for Dr. Carlos Tan that was in Dr. Stokes' office. The top right portion of the CV, however, was missing from the SOI's photograph (Doc. 107 – 37) (Government's Exhibit 1C).

- The Source of Information then sent a second photograph of Dr. Tan's CV to TFO Manning with the top right corner in view (Government's Exhibit 1C) (Doc. 107 – 39).

The Source of Information agreed that she did not identify herself in the July 22, 2014 text message listed in Government's Exhibit 1A, and that she "*probably*" had sent TFO Manning a text message before that (Doc. 107 – 64). She also testified that she may have "*possibly*" communicated with TFO Manning after the July 22, 2014 text but before the first July 24, 2014 text in the Government's exhibits (Doc. 107 – 70). She testified the only reason she sent a text message to TFO Manning was to provide the DEA information about Dr. Stokes, and that the text messages were sent to help the DEA's investigation (Doc. 107 – 68-69).

She testified that she sent the photographs to help law enforcement with its investigation (Doc. 107 – 69, 74). She testified that TFO Manning was aware that she going to take a picture of Dr. Tan's CV, and that she took his "*nothing risky*" comment to mean "*[t]hat I shouldn't be doing anything risky*" due to Dr. Stokes' office door being locked (Doc. 107 – 76). She also testified that when she

9

ultimately took the photograph of Dr. Tan's CV the door to Dr. Stokes' office was open (Doc. 107 – 75). With regard to patient records, she testified that she had sent patient records to the confirmation companies "*in connection with the treatment of the patients*," but that she was not permitted to send copies of patient records if there was no medical purpose (Doc. 107 – 65-66).

TFO Manning testified that the Source of Information first called the DEA in July of 2014, and that he along with Special Agent Nesbitt met with the Source of Information at a Starbucks on July 14, 2014 (Doc. 99 – 13-14). He testified that he did not "*provide any directives to the source of information*." (Doc. 99 – 15). TFO Manning explained that he placed one call to the Source of Information after she sent the initial photograph of Dr. Tan's CV on July 25, 2014: "*I called to try to confirm what it said in the corner of the photograph*." (Doc. 99 – 27, 29). TFO Manning testified that the Source of Information relayed to him what the corner said, and that he received a photograph from the Source of Information of the corner several hours later (Doc. 99 – 27, 29). He also testified that, based on the Source of Information's text messages, he assumed the CV was on Dr. Stokes' office desk behind a locked door, and that the Source of Information indicated a desire to access Dr. Stokes' office and take a picture of the CV (Doc. 99 – 65). TFO Manning also testified that he thought his "*nothing risky*" response was a directive not to go into Dr. Stokes' office (Doc. 99 – 65-66).

10

C. <u>Confidential Source v. Source of Information</u>

TFO Manning testified that a source of information is simply an individual "*that provides information to the DEA*." (Doc. 99 – 11). He testified that a confidential source is "*an individual that is approved by upper management of DEA to work... at the direction of agents... sometimes they're paid, sometimes they're not paid. Sometimes they're working for expectation of benefit on their cases, and they would do what the agents tell them to do*." (Doc. 99 – 12).

Special Agent Furman further explained: "*[a] source of information is an individual who – it could be on a one-time basis or occasionally provides information to law enforcement, is not involved in any kind of illegal activity, and is not part of the investigation, just providing information and intelligence*." (Doc. 99 – 120). He explained that a source of information "*is not working under the direction of law enforcement*." (Doc. 99 – 122, 136). He agreed that a source of information can evolve into a confidential source (Doc. 99 – 122), and "*if they're actively involved where they can participate in the investigation, that's point – that's one point where you would have a source of information be processed into a confidential source*." (Doc. 99 – 122).

Special Agent Nesbitt testified that there was "*no question*" that Tameka Stokes was working at the direction of the DEA (Doc. 105 – 367), and that he made her a confidential source because "*she was willing to go get evidence on our*

*behalf...*" (Doc. 105 – 375-76).  He testified that the decision to make an individual

a confidential source can be "*on the fly*" and that "*there's not a set rule.*" (Doc. 105

– 377).  He testified that "*there's lots of gray*" when it comes to distinguishing a

confidential source from a source of information (Doc. 105 – 398).  In fact, he

testified that an individual labeled "*S.O.I. Number 4*" in the search warrant

affidavit actually referred to the Confidential Source, Tameka Stokes (Doc. 105 –

400).  When asked why Cheryl Thomas was not made into a confidential source,

Special Agent Nesbitt responded: "*The only reason I can think of is her access was

somewhat limited.*" (Doc. 105 – 395).

ARGUMENT AND CITATIONS OF AUTHORITY

I.      The Confidential Source's Video Recordings Must Be
        Suppressed.

"A search by a private person does not implicate the Fourth Amendment

unless he acts as an instrument or agent of the government." *United States v.*

*Steiger*, 318 F.3d 1039, 1045 (11th Cir. 2003).  Here, the law enforcement agents

who testified at the hearing agreed that the Confidential Source was acting at the

direction of law enforcement when she made the covert recordings in question.

Therefore, the Fourth Amendment is implicated.

The primary question before the Court is whether the Confidential Source

had "common authority over or other sufficient relationship to the premises" at the

time she obtained the video recordings.  *United States v. Backus*, 349 F.3d 1298,

12

1299 (11th Cir. 2003). Indeed, "a warrantless entry is valid when it is based upon the consent of a third party whom the police, at the time of entry, reasonably believed possessed authority over the premises." *United States v. Mercer*, 541 F.3d 1070, 1074 (11th Cir. 2008).

As the Supreme Court has explained: "[c]ommon authority… rests… on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." *United States v. Matlock*, 415 U.S. 164, n. 7, 172 (1974). Law enforcement, however, has a duty to investigate statements a third party makes relating to authority: "where an officer is presented with ambiguous facts related to authority, he or she has a duty to investigate further before relying on the consent." *United States v. Kimoana*, 383 F.3d 1215, 1222 (10th Cir. 2004).

Dr. Stokes is a medical doctor who owned and operated the medical clinic in question. The Confidential Source testified that she was initially hired by Dr. Stokes as a medical assistant in March of 2014, and that her job duties primarily consisted of the following:

- Checking blood pressure
- Asking about pain level

- Filling out prescriptions

- Giving patients prescriptions and their next appointment date

While the Confidential Source testified that she had access to the "*whole building*," she also testified that she had the following restrictions placed on her access to Dr. Stokes' medical clinic at the time of the covert recordings in July of 2014:

- She was one of many employees with specific job duties.

- She was not allowed to speak with other staff members or patients.

- She was assigned to specific exam rooms and waited in the exam rooms for patients to come to her.

- She was not permitted to be "*moving around like we usually do*."

- She had a key to the clinic, but that key did not open Dr. Stokes' office door.

- She agreed that she was not allowed to share medical information with anyone due to HIPAA.

While there are few cases that discuss common authority in the employee-employer context, Counsel for Dr. Stokes contends that it simply cannot be said that a medical assistant with such limitations has actual or apparent "common authority" over the entire medical practice. In its earlier memorandum, the Government cited to *United States v. Jenkins*, 46 F.3d 447, 451 (5th Cir. 1995)

14

(Doc. 34) for the proposition that the Confidential Source had the requisite authority.[1]

In *Jenkins*, a racketeering and obscenity case, the Fifth Circuit found that the employee of a company that supplied adult videotapes to adult bookstores had authority to consent to the search of the company's videotapes that were mailed to him. In so finding, the Fifth Circuit reasoned that the employee had "unlimited access to the videotapes, absolute dominion and control over the videotapes and no direct supervision, or indeed any employees in the geographic vicinity." *Id*., at 455-56. Here, the facts are very much different. Unlike the employee in *Jenkins*, the Confidential Source in the instant case was one of many employees who labored under the supervision of Dr. Stokes with significant restrictions.

Other federal courts have found that an employee does not possess the requisite authority to consent to such a search. Indeed, each case requires a factually intensive inquiry. *See*, *United States v. Jones*, 335 F.3d 527 (6th Cir. 2003), finding that a handyman employed by the defendant did not possess actual or apparent authority to permit police officers to enter and search the defendant's residence and noting that, "[i]f the employee's job duties include the granting of access to the premises, authority to consent is more likely to be found."; *United*

---

[1] Dr. Stokes discussed *Jenkins* in his earlier reply memorandum and explained how *Jenkins* actually bolsters Dr. Stokes' position (Doc. 36).

*States v. Corral*, 339 F.Supp.2d 781 (W.D. Texas 2004), finding that a housekeeper lacked authority to consent to a search by law enforcement despite the fact that the housekeeper told law enforcement that she was "in charge" and that she cleaned the "whole" house.

Based on the facts learned at the evidentiary hearing, the Confidential Source did not have actual authority to consent to a search of Dr. Stokes' medical clinic. And while the Government may lean on the fact that the Confidential Source told law enforcement that she had access to the entire building, it was unreasonable for law enforcement to believe such a blanket, uncorroborated statement given the fact that the Confidential Source was merely a medical assistant. In addition, it was also unreasonable for law enforcement to believe that a medical assistant had apparent authority to disclose patient information when HIPAA specifically makes such activity unlawful. For these reasons, the video recordings obtained by the Confidential Source must be suppressed.

II.     The Source of Information's Photographs must be suppressed.

The Government argues that the Source of Information was acting independently when she sent law enforcement photographs of patient information and the CV of Dr. Carlos Tan (Doc. 46 – 4). The issue before the Court regarding the Source of Information is therefore whether she was acting as an agent of the Government at the time she obtained the photographs in question. "For a private

person to be considered an agent of the government, we look to two critical factors: (1) whether the government knew of and acquiesced in the intrusive conduct, and (2) whether the private actor's purpose was to assist law enforcement efforts rather than to further his own ends." *United States v. Steiger*, 318 F.3d 1039, 1045 (11th Cir. 2003).

First, the Government knew of and acquiesced to the Source of Information's intrusive conduct. The Government attempts to make a large distinction between a "confidential source" and a "source of information" in order to show that the Source of Information was acting independently. A review of the testimony suggests that the primary difference between a confidential source and a source of information is that a confidential source works under the direction of the DEA and may receive some type of benefit. Special Agent Nesbitt, however, testified that the distinction to make an individual a confidential source can be "*on the fly*," that "*there's no set rule*," and that "*there's lots of gray*" when it comes to distinguishing a confidential source from a source of information.

Despite the label applied by the DEA, Counsel for Dr. Stokes contends that TFO Manning did in fact direct the Source of Information based on the following evidence that was produced at the hearing:

17

- TFO Manning met with the Source of Information to discuss Dr. Stokes' medical practice and provided her with his business card.

- The Source of Information soon thereafter text messaged TFO Manning a photograph containing patient information.

- The Source of Information then provided TFO Manning with information about Dr. Stokes interviewing another physician.

- TFO Manning asked the Source of Information for the name of the physician: "*Do you know the name? Maybe Carlos Tan?*"

- The Source of Information told TFO Manning that she intended to take a picture of the physician's CV, which was in Dr. Stokes' office.

- In response, TFO Manning instructed the Source of Information on how to handle herself by telling her "*[n]othing risky.*"

- TFO Manning admitted to calling the Source of Information after she sent the first picture of the CV to inquire about the top right corner of the CV.

- Unsurprisingly, the Source of Information sent a second picture of the CV with the top right corner in view to TFO Manning.

Even if the Court were to find that the Government never directed the Source of Information to take photographs or gather information (and therefore was not technically a "confidential source"), that is not the standard under *Steiger* to determine if she was acting as a government agent. Under *Steiger*, the Government only has to know about the conduct and acquiesce to it in order for the individual to be acting as an agent. Based on the text messages and testimony, it cannot be said that TFO Manning did not know of the Source of Information's plan or acquiesce to it. Indeed, TFO Manning was an active participant in the endeavor by text messaging with and calling the Source of Information.

Second, the Source of Information's actions were solely to help law enforcement. The Source of Information testified the only reason she sent a text message to TFO Manning was to provide the DEA with information about Dr. Stokes, and that the text messages were sent to help the DEA's investigation. Under these circumstances, the Source of Information was acting as a government agent and the Fourth Amendment is therefore implicated.

To the extent the Government argues that the Source of Information possessed common authority over Dr. Stokes' medical clinic, Counsel for Dr. Stokes contends that evidence to the contrary is even stronger for the Source of Information than for the Confidential Source. The Source of Information testified that her job duties were limited to collecting and screening urine samples, that she

primarily stayed in the clinic's lab, and that Dr. Stokes employed a variety of health care professionals at the clinic. She testified that she had access to the electronic patient files, but that she only accessed these files to pull a patient's insurance information for billing purposes. She further testified that she had a key to the main clinic and that the key also opened the door to the lab and storage closets. She also testified that she was not permitted to share patient information if there was no medical purpose for it. And the fact that the Source of Information could not initially retrieve Dr. Carlos Tan's CV from Dr. Stokes' office should have been enough to show that she did not possess common authority.

Special Agent Nesbitt's testimony was also insightful as he testified that he did not make the Source of Information into a Confidential Source because her access at the clinic was limited. Due to the Source of Information's obvious limitations relating to access at the clinic, the Source of Information did not have actual or apparent authority to consent to a search of Dr. Stokes' medical clinic. Therefore, the photographs the Source of Information obtained must be suppressed.

III.    <u>The Photographs and Videos were obtained in Violation<br>of Federal and State Law and Must Be Suppressed.</u>

In Dr. Stokes' pre-hearing briefing of this issue, Counsel for Dr. Stokes argued extensively that searches which yielded the photographs and videos in question violated federal and state law (Doc. 30 & 47)[2]. The Government previously argued that "*regulations under HIPAA specifically authorize disclosure of otherwise confidential medical records for law enforcement purposes.*" (Doc. 46 – 5). Special Agent Nesbitt even testified: "*My understanding is HIPAA doesn't apply to law enforcement stuff when it involves investigations...*" (Doc. 105 – 380). But that is not the law.

In *United States v. Wilk*, 572 F.3d 1229, 1236 (11th Cir. 2009), the Eleventh Circuit held that HIPAA authorizes the disclosure of medical records for law enforcement purposes, but the disclosure must be "in response to a court order or grand jury subpoena." Here, there was no court order or grand jury subpoena.[3] Therefore, federal law was violated when the Confidential Source and Source of Information obtained and shared patient information.

---

[2] Specifically, Dr. Stokes argued that the Confidential Source and Source of Information violated O.C.G.A. § 16-11-62(2) and 42 U.S.C. 1320d-6(a) which both carry criminal penalties.
[3] As discussed in Dr. Stokes' previous briefing, 45 C.F.R. § 164.512(f)(5) carves out an exception which allows a covered entity to disclose protected health information to law enforcement. The Confidential Source and Source of Information, however, are not covered entities under the Eleventh Circuit's holding in *Murphy v. Dulay*, 768 F.3d 1360, 1369 (11th Cir. 2014).

While Counsel contends that the Court should suppress the photographs and videos based on the sole fact that federal and state law were violated, Counsel concedes that the case law on this point is slim. The violation of federal law, however, should have an impact on the reasonableness of the searches. After all, law enforcement knew, or should have known, that such a search would violate federal law. Therefore, it was unreasonable for law enforcement to believe that the Source of Information and Confidential Source had the requisite authority to obtain and disclose protected patient information.

<u>CONCLUSION</u>

For these reasons, Counsel for Dr. Stokes respectfully requests that the Court suppress any and all evidence unlawfully seized by the Government's Source of Information and Confidential Source from Dr. Stokes' medical clinic.

This 2nd day of March, 2017.

PATE & JOHNSON, LLC

_____

Pate & Johnson, LLC  
101 Marietta Street, Suite 3300  
Atlanta, Georgia 30303  
(404) 223-3310

Page A. Pate  
Georgia Bar No.: 565899

Jess B. Johnson  
Georgia Bar No.: 322066

22

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that I have this day electronically filed the foregoing Notice with the Clerk of Court using the CM/ECF system which will automatically send email notifications of such filing to all counsel of record in this matter.

This 2nd day of March, 2017.

PATE & JOHNSON, LLC

_____

Pate & Johnson, LLC
101 Marietta Street, Suite 3300
Atlanta, Georgia 30303
(404) 223-3310

Page A. Pate
Georgia Bar No.: 565899

Jess B. Johnson
Georgia Bar No.: 322066