IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

v.

OSCAR JAMESON STOKES, M.D. and
TASHAWNA DENISE STOKES, M.D.

CRIMINAL ACTION FILE NO.

1:14-CR-290-TWT-JKL

## NON-FINAL REPORT AND RECOMMENDATION

The first superseding indictment in this case charges Defendant Oscar Jamison Stokes, M.D., and Defendant Tashawna Denise Stokes, M.D., a married couple, with conspiracy to distribute and dispense controlled substances in violation of 21 U.S.C. § 846 and 21 U.S.C. § 841, maintaining a place for drug distribution, illegal distribution of controlled substances, and money laundering of the proceeds of the distribution scheme. [*See* Doc. 55] This Report and Recommendation addresses the following pending motions:

(1)    Oscar Stokes's Motion to Suppress Evidence and for Return of Seized Property [Doc. 24], adopted by Tashawna Stokes [Doc. 84];

(2)     Oscar Stokes's Motion to Suppress Evidence Obtained by the Government's Source of Information [Doc. 30], adopted by Tashawna Stokes [Doc. 84]; and

(3)     Tashawna Stokes's Motion to Suppress Evidence Seized Pursuant to Two Constitutionally Deficient Warrants [Doc. 82], adopted by Oscar Stokes [Doc. 86].

Evidentiary hearings on the Motion to Suppress Evidence Obtained by the Government's Source of Information and the Motion to Suppress Evidence Seized Pursuant to Two Constitutionally Deficient Warrants were held before me on May 13, 2016 [Doc. 99], November 10, 2016 [Doc. 105], and December 16, 2016 [Doc. 107].   To refer to the hearing transcripts in this Report and Recommendation, I cite the docket number, followed by the page number of the PDF file.   Also, on June 12, 2017, I held oral argument on Tashawna Stokes's Motion to Suppress Evidence Seized Pursuant to Two Constitutionally Deficient Warrants [Doc. 125].   The motions are now fully briefed and ripe for resolution.

I organize my discussion of these pending motions as follows.   First, I address the two motions that challenge the search warrants at issue in this case: Oscar Stokes's Motion to Suppress Evidence and for Return of Seized Property

2

[Doc. 24] and Tashawna Stokes's Motion to Suppress Evidence Seized Pursuant to Two Constitutionally Deficient Warrants [Doc. 82].  For the reasons stated below, I **RECOMMEND** that those motions be **DENIED**.

Second, I address Oscar Stokes's Motion to Suppress Evidence Obtained by the Government's Source of Information [Doc. 30], in which Defendants seek to suppress (1) video recordings made by Innovative Pain Management Center employee Tameka Stokes (no relation to either Defendant), whom the government had deployed as a confidential source, and (2) photographs that Cheryl Thomas, also an employee of Innovative Pain Management Center and a source of information to the government, sent to the Drug Enforcement Administration ("DEA") agents investigating the case.  For the reasons stated below, I **RECOMMEND** that motion be **DENIED**.

## I.    Defendants' Motions Challenging the Search Warrants

### A.    Search Warrant and Application

On August 6, 2014, United States Magistrate Judge Gerrilyn G. Brill issued federal search warrants for two locations:  (1) a clinic known as Innovative Pain Management Center, located at 1300 Hembree Road, Building 100, Suite B, Roswell, Georgia (the "Clinic") and (2) the Stokes's residence located at 456

Woodliff Place, Milton, Georgia (the "Stokes Residence").   Judge Brill also authorized the seizure of certain bank accounts held in the name of Innovative Pain Management Center at Bank of America.   The affidavits for the search warrants were the same, with DEA Special Agent Scott Nesbit as the affiant. [*See* Docs. 33-1 to 33-3.]

Special Agent Nesbit summarized his experience and training as a DEA agent.   He has been employed as a Special Agent with the DEA since 2003. [Doc. 33-1 ¶ 1.]   Upon being hired as a Special Agent with the DEA, he attended training in all aspects of narcotics investigations, including the methods of unlawful drug trafficking, the means by which drug traffickers derive, launder, and conceal their profits from drug trafficking, the use of assets to facilitate drug trafficking, and forfeiture law.   [*Id.* ¶ 7.]   He has also participated in investigations involving various controlled substances, including at least ten drug cases that involved pain clinics.  [*Id.*]

Special Agent Nesbit has experience regarding investigations of individuals and organizations that illegally disburse or dispense controlled substances under the guise of operating as a legitimate medical clinic or pharmacy.  [Doc. 33-1 ¶¶ 9-14.]   At those so-called "pill mills," individuals obtain a prescription for

4

controlled substances from a physician who issues the prescription without conducting a minimal professionally required medical assessment of the patient's complaints or properly assessing whether disbursing the controlled substances is medically appropriate.  [*Id.* ¶ 12.]  Special Agent Nesbit listed fifteen examples of signs that indicate a medical clinic is operating as an illicit pill mill:

> i. Most customers pay cash;
>
> ii. Patients travel long distances (from out-of-county or out-of-state);
>
> iii. Patients line up for "appointments" hours in advance;
>
> iv. "Appointments" are not for a specific time;
>
> v. "Patients" travel in groups, often with a "sponsor" responsible for paying for everyone's visit.
>
> vi. High volume of "patients" going through the clinic;
>
> vii. Cursory physical examination, or no physical examination, during initial and follow-up visits;
>
> viii. Brief initial and follow-up visits where many times the patient does not see the physician;
>
> ix. Doctor does not undertake an independent evaluation of patient (i.e., patient suggests or directs the medication to be prescribed);
>
> x. Doctor writes out prescriptions for controlled substances and places them in the patient's file prior or during the patient's visit;

xi. Failing to treat patients with anything other than controlled substances;

xii. Failing to heed warnings by others that drug-seeking persons are trying to obtain controlled substances from the doctor;

xiii. "Patients" who appear and behave in a manner consistent with abusing, or being addicted to, controlled substances;

xiv. Pharmacies have stopped filling the physician's prescriptions due to suspicious activity or high number of controlled substance prescriptions; and

xv. Clinic owners/operators and employees are hyper-aware of law enforcement.

[*Id.* ¶ 14(u)(i)-(xv).]

Over the span of 25 single-spaced pages, Special Agent Nesbit summarized the information that DEA obtained during its near 17-month investigation into the Clinic and Oscar Stokes, including: information from numerous undercover visits by law enforcement posing as patients; repeated surveillance; information reported by clinic employees, patients, and the owner of the medical center complex where the Clinic was located; state prescription monitoring programs; and financial records. [*See* Doc. 33-2 ¶¶ 20-27; Doc. 33-3 ¶¶ 28-48.]

On the face of each warrant, in the section where the materials to be searched for and seized are to be described, the warrant states "See Exhibit B."

(Government's Exhibit ("GX") 6, GX 7.)   Exhibit B to each warrant is a five-page document titled "Items to be Searched for and Seized" that lists documents, electronically stored information, and other things that agents are authorized to search for and seize.

### B. Motion to Suppress Evidence Seized Pursuant to Two Constitutionally Deficient Warrants [Doc. 82]

Tashawna Stokes moves to suppress evidence seized pursuant to the search warrants on the grounds that the warrants fail to comply with the Particularity Clause of the Fourth Amendment.   She maintains that both warrants failed to use appropriate words of incorporation with respect to the items that the warrants authorized law enforcement agents to search for and seize.   [Doc. 82 at 5-6; Doc. 112 at 2-3.]   She also argues that there is no evidence that "Exhibit B" accompanied the warrants at the time that they were executed.   [Doc. 82 at 6; Doc. 112 at 3.]

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."   U.S. Const. amend. IV.

7

"When police conduct a search pursuant to a warrant, the warrant must comply with all four of the requirements of the Fourth Amendment: (1) it must be based on probable cause, (2) the probable cause must be supported by sworn testimony or an affidavit, (3) the place to be searched must be described with particularity, and (4) the evidence to be seized must be particularly described." *United States v. Brown*, 596 F. Supp. 2d 611, 624 (E.D.N.Y. 2009) (citing *Groh v. Ramirez*, 540 U.S. 551, 557 (2004)).  In *Groh*, the Supreme Court suggested—and noted that most Courts of Appeals have held—that a warrant may comply with the Particularity Clause by referencing another document "if the warrant uses appropriate words of incorporation, and if the supporting document accompanies the warrant." *Groh*, 540 U.S. at 557-58.

Citing *Groh*, Tashawna Stokes argues that the two warrants violate the Particularity Clause of the Fourth Amendment in that each warrant used the phrase "See Exhibit B" to describe the items that agents were authorized to search for and seize.  [Doc. 82 at 5-6; Doc. 112 at 2-3, 5-6.]  She contends that the warrants here do not "incorporate by reference" the items in Exhibit B because the phrase **references** Exhibit B, but does not **incorporate** the contents of Exhibit

B into the warrant. In other words, the term "see" is insufficient to indicate that the contents of Exhibit B are made part of each of the search warrants.

I disagree. Tashawna Stokes focuses on the word "see," but she ignores the next word: "Exhibit." That word makes all the difference. Black's Law Dictionary defines "Exhibit" is defined as "A document attached to ***and made part of*** a pleading, motion, contract, or other instrument." Black's Law Dictionary 694 (10th ed.) (emphasis added). So, when the warrant instructs the reader to "see" an "exhibit" to the warrant, the warrant is making it clear that the contents of the exhibit are being made part of—or incorporated by reference into—the warrant. This is the only common-sense, rational way to read the phrase "See Exhibit B" in this context. Under these circumstances, I am persuaded that the warrants used appropriate words of incorporation when referring to Exhibit B for the identity of things to be searched for and seized.

Tashawna Stokes next argues that, even if the warrants contain appropriate words of incorporation, the fruits of the searches should be suppressed because the government has not shown that Exhibit B was physically attached to the

warrants when they were executed.[1]  [Doc. 112 at 7-13.]  Again relying on *Groh*, Tashawna Stokes contends that the supporting document must accompany the warrant in order for the court to construe the warrant by reference to another document, and that the supporting document must accompany the warrant at the time of execution, not just when the warrant is issued.  [*Id*. at 8.]

The government responds that it does not matter whether Exhibit B was attached to the warrants at the time they were executed.  [Doc. 118 at 19.]  Citing the Fourth Circuit's decision in *United States v. Hurwitz*, 459 F.3d 463, 472 (4th Cir. 2006), the government contends that all that is required is that the warrant include appropriate words of incorporation.  [*Id.*]

Tashawna Stokes overreads *Groh*.  The Supreme Court did not hold that a document incorporated by reference into a warrant must physically be present at a search at the time of execution.  In fact, the Supreme Court recognized that "neither the Fourth Amendment nor Rule 41 of the Federal Rules of Criminal Procedure requires the executing officer to serve the warrant on the owner before commencing the search."  *Groh*, 540 U.S. at 562 n.5.  Similarly, in *Hurwitz*, the Fourth Circuit held, citing *Groh*, that there is no "constitutional mandate that an

---

[1] Tashawna Stokes does not argue that Exhibit B was omitted from the warrant at the time it was presented to and approved by the Magistrate Judge.

executing officer possess or exhibit the affidavit or any other document incorporated into the warrant at the time of the search *in order for the warrant to be valid*." 459 F.3d at 472; *see also United States v. Mwangi*, No. 1:09-CR-107-TWT-AJB, 2010 WL 520793, at *5 n.13 (N.D. Ga. Feb. 5, 2010) (rejecting argument that law enforcement was required to provide a copy of a search warrant in light of *Groh* and *Hurwitz*), *report and recommendation adopted at id.* *1.  Expanding on its observation in *Groh* that neither the Fourth Amendment nor Federal Rule of Criminal Procedure 41 requires an executing officer to present the property owner with a copy of the warrant before conducting a search, the Supreme Court has explained:

> "The absence of a constitutional requirement that the warrant be exhibited at the outset of the search, or indeed until the search has ended, is ... evidence that the requirement of particular description does not protect an interest in monitoring searches."  The Constitution protects property owners not by giving them license to engage the police in a debate over the basis for the warrant, but by interposing, *ex ante*, the "deliberate, impartial judgment of a judicial officer ... between the citizen and the police," and by providing, *ex post*, a right to suppress evidence improperly obtained and a cause of action for damages.

*United States v. Grubbs*, 547 U.S. 90, 98-99 (2006) (alterations in original) (citations omitted).  Other courts have also concluded that a search warrant need

11

not be in the physical possession of the agents executing the warrant at the time of entry.  *See United States v. Cazares-Olivas*, 515 F.3d 726, 730 (7th Cir. 2008) ("[T]he fourth amendment does not require officers to have a warrant in hand when searching); *United States v. Bonner*, 808 F.2d 864, 869 (1st Cir. 1986).[2]

Since an officer need not have a search warrant in hand when conducting a search, it follows that if Exhibit B was not physically attached to the warrants at

---

[2] To support her reading of *Groh*, Tashawna Stokes relies on the *Groh* Court's reasoning as to why it applied the presumption of unreasonableness to a search conducted pursuant to a facially invalid warrant.  [Doc. 112 at 5-6, 12-13.] The Supreme Court explained its rationale as follows: "[U]nless the particular items [to be seized] described in the affidavit are also set forth in the warrant itself (or at least incorporated by reference, and the affidavit present at the search), there can be no written assurance that the Magistrate actually found probable cause to search for, and to seize, every item mentioned in the affidavit." *Groh*, 540 U.S. at 560.  Here, that rationale is of no moment because the warrants were not facially invalid.  As explained above, the warrants incorporated Exhibit B by appropriate words of incorporation, and there is no doubt, from the face of the warrant or otherwise, that Judge Brill found probable cause to search for and seize every item identified in Exhibit B.  Tashawna Stokes also cites the Eleventh Circuit's decision in *United States v. Pratt*, 438 F.3d 1264 (11th Cir. 2006), as indicating that in this Circuit, a warrant that incorporates by reference another document must have the supporting documents appended to the warrant at the time of its execution.  [Doc. 82 at 5; 112 at 6.]  Specifically, she cites a footnote in which the court stated "Search warrants can incorporate by reference the words of supporting documents if the documents are attached to the warrant." *Pratt*, 438 F.3d at 1269 n.8 (citing *Groh*, 540 U.S. at 560).  I do not believe that *Pratt* establishes a rule that a warrant must be in the physical possession of law enforcement at the time and place of execution, nor does the decision indicate that the Circuit Court would willing to adopt such a rule.

the time of the searches, suppression would not be not required either.  Of course, it is conceivable that, under some circumstances, the failure of an executing officer to provide a copy of a warrant to the property owner could result in suppression, for example, if the party seeking suppression was prejudiced or the government intentionally violated Rule 41.  *See, e.g.*, *United States v. Loyd*, 721 F.2d 331, 333 (11th Cir. 1983) ("[U]nless a clear constitutional violation occurs, noncompliance with Rule 41 requires suppression of evidence only where (1) there was 'prejudice' in the sense that the search might not have occurred or would not have been so abrasive if the rule had been followed, or (2) there is evidence of intentional and deliberate disregard of a provision in the Rule.") (citation omitted).  Here, Tashawna Stokes has not established that she suffered any prejudice or that the government acted intentionally to refuse to prove her with a complete copies of the warrants or that the scope of the search of the Clinic or the Stokes Residence exceeded the scope of Exhibit B to the search warrants.

For these reasons, I **RECOMMEND** that the Motion to Suppress Evidence Seized Pursuant to Two Constitutionally Deficient Warrants [Doc. 82] be **DENIED**.

13

**C.     Motion to Suppress Evidence and Return of Seized Property [24]**

Oscar Stokes moves to suppress the fruits of the searches pursuant to the warrants on the grounds that probable cause did not exist for the issuance of either warrant.  [Doc. 24.]  Ignoring the great detail set forth in Special Agent Nesbitt's affidavit, Oscar Stokes argues that for probable cause to exist, a qualified physician or medical expert should have reviewed his prescribing practices before the issuance of the warrants.  Thus, he maintains, there is no medical basis for Special Agent Nesbit's opinion that he was prescribing controlled substances "outside the normal course of his practice and without a legitimate legal need."  [*See* Doc. 33-2 ¶ 21.]  He also requests that funds seized pursuant to the warrants also be returned due to the lack of probable cause.  [Doc. 24 at 5-6.]

The government responds that there is no requirement for a medical opinion to establish probable cause.  Citing *United States v. Joseph*, 709 F.3d 1082 (11th Cir. 2013), the government argues that expert testimony is not required to establish that a defendant violated the Controlled Substance Act because the government can obtain a conviction through lay testimony, so *a fortiori*, it can establish probable cause without expert testimony.  [Doc. 33 at 10-

12.]  The government also summarizes the extensive detail that Special Agent Nesbit set out in his affidavit.  [*Id.* at 3-8.]

In considering an application for a search warrant, the judicial officer's task is to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, there is a fair probability that contraband or evidence of a crime will be found in a particular place.  *Illinois v. Gates*, 462 U.S. 213, 238 (1983).  In examining a challenge to a search warrant, a reviewing court applies a different standard, which accords "great deference" to the judicial officer's finding of probable cause.  *Id.* at 236.  The reviewing court must ask whether the judicial officer had a substantial basis for concluding that probable cause existed.  *Id.* at 238-39; *see also Massachusetts v. Upton,* 466 U.S. 727, 728 (1984) (*per curiam*) ("[T]he task of a reviewing court is not to conduct a de novo determination of probable cause, but only to determine whether there is substantial evidence in the record supporting the magistrate's decision to issue the warrant."); *United States v. Miller*, 24 F.3d 1357, 1363 (11th Cir. 1994) ("[R]eviewing courts lend substantial deference to an issuing magistrate's probable cause determinations.").  When a search is conducted pursuant to a warrant, the defendant bears the burden to show that the warrant is invalid.

15

*United States v. Lockett*, 533 F. App'x 957, 965 (11th Cir. 2013); *United States v. Hinton*, 113 F. Supp. 3d 1277, 1292 (N.D. Ga. 2015), *report and recommendation adopted*, *id.* at 1279, *aff'd*, No. 16-11594, 2017 WL 191930 (11th Cir. Jan. 18, 2017).

I agree with the government that *United States v. Joseph* forecloses Oscar Stokes's argument. The facts of *Joseph* are remarkably similar. In that case, the a search warrant to search the defendant's residence was supported by a 39-page affidavit, which set forth a "litany of facts" that suggested the defendant violated the Controlled Substances Act and that evidence of the criminal conduct would be found at his home. *Joseph*, 709 F.3d at 1099. Those facts included evidence obtained by undercover agents, statements from patients concerning how the defendant was conducting medical examinations, and evidence that some patients died from the drugs the defendant prescribed them. *Id.* Notwithstanding those facts, the defendant argued that the affidavit was deficient because it was not supported by expert medical testimony that his practices deviated from the usual course of professional practice or were not for a legitimate medical purpose. *Id.*

The Eleventh Circuit rejected the argument, explaining:

> Expert medical testimony is not required to establish
> probable cause that a defendant violated the [Controlled

Substances] Act.  Expert medical testimony is not even
necessary to sustain a conviction under the Act because
a jury may find that a doctor violated the Act "from
evidence received from lay witnesses surrounding the
facts and circumstances of the prescriptions."   The
"probable cause" standard requires the government to
produce much less evidence than it must present to
sustain its burden of proof at trial.  If expert medical
testimony is not required to prove beyond a reasonable
doubt that [defendant] violated the Act, expert
testimony is not required to establish probable cause
that he violated the Act.   And we have held that a
warrant affidavit establishes probable cause that the
defendant violated the Act when the affidavit was not
supported by expert testimony that the physician
violated accepted medical standards.

*Joseph*, 709 F.3d at 1099-1100 (citations omitted).

In light of the holding in *Joseph,* I readily conclude that medical opinion
evidence was not required to establish probable cause to support issuance of the
warrants in this case.  Moreover, Oscar Stokes makes no real attempt to argue that
the "litany of facts" that Special Agent Nesbit detailed in his affidavit otherwise
fail to establish probable cause to believe that Oscar Stokes violated the
Controlled Substance Act.  Therefore, Oscar Stokes's motion to suppress should
be denied.

Finally, since Oscar Stokes's request for the return of funds seized pursuant
to search warrants is predicated entirely on his meritless argument that Special

Agent Nesbit's affidavit failed to establish probable cause, his motion to the return of seized property should be denied as well.[3]

For these reasons, I **RECOMMEND** that the Motion to Suppress Evidence and Return of Seized Property [Doc. 24] be **DENIED**.

## II.   Motion to Suppress Evidence Obtained by the Government's Source of Information [Doc. 30]

Oscar Stokes also moves to suppress (1) photographs of medical records and a résumé that Clinic employee Cheryl Thomas took using her mobile phone and sent via text message to DEA William Manning, a deputy sheriff with the Gwinnett County Sheriff's Office and DEA task force officer, and (2) covert video recordings made by Clinic employee Tameka Stokes, whom the DEA had deployed as a confidential source in connection with their investigation of the defendants and the Clinic.  [*See* Doc. 30, 47.]  As noted above, an evidentiary hearing was held over three days.  The government called Deputy Manning, DEA Special Agent Geoffrey Furman, Special Agent Nesbit, Tamika Stokes, and

---

[3] Counsel for Oscar Stokes advised the Court at a status conference on June 22, 2017, that he intended to file an additional motion for the return of funds based on recent changes in the law concerning government seizure of assets. Since the grounds for seeking the return of funds in the forthcoming motion appear to be different than the motion presently pending before the Court, I take no view as to the merits of the forthcoming motion.

Thomas.  The parties have filed post-hearing briefs on the issues raised in Oscar

Stokes' motion to suppress.  [Docs. 110, 118.]

I first address Oscar Stokes's motion to suppress as it relates to the

photographs that Thomas provided the DEA and then address the motion as it

relates to the videos that Tamika Stokes covertly gathered.  For the following

reasons, I conclude that the photographs and the videos should not be suppressed.

**A.    Photographs Taken By Cheryl Thomas**

**1.    Background**

Cheryl Thomas started work at the Clinic in June 2013, around the time

that the Clinic first opened.  [Doc. 107 at 10, 80.]  Her job duties included

collecting and testing patients' urine samples for drugs.  [*Id.* at 11, 14.]  She

worked in a laboratory that was connected to a restroom.  [*Id.* at 12-13.]  The lab

was across the hall from Oscar Stokes's office.  [*Id.* at 13.]  Initially, when

Thomas started working at the Clinic, urine screens were performed entirely in-

house, but at some point, outside "confirmation companies" began to confirm the

test results.  [*Id.* at 14.]  Eventually, Thomas came to be an employee of both the

confirmation companies and Oscar Stokes.  [*Id.* at 15.]

19

Cheryl Thomas would provide the results of the urine tests to Oscar Stokes, either by handing the results to him or placing them on his desk.  [Doc. 107 at 16.]  On the occasions when Thomas would need to leave test results on Oscar Stokes's desk, she would walk into his office through the open door and place them on the desk.  [*Id.* at 17.]

She had a key to the lab.  [Doc. 107 at 20.]  The key also worked on the doors to the areas that Thomas needed to access, including the main door to the Clinic, a storage room, and a supply closet.  [*Id.* at 20-21.]  She had access to patient files through AthenaNet, a cloud-based electronic medical record database, but she did not make any changes to the contents of the files.  [Doc. 107 at 21-22.]

In or around June 2014, Thomas contacted the DEA hotline concerning the Clinic.  [Doc. 107 at 22-23.] Around a week later either Deputy Manning or Special Agent Nesbit called her and said that they had received her information from the hotline and that they would be interested in speaking with her.  [Doc. 107 at 58.]  They arranged to meet in person.  [*Id.*]  In mid-July 2014, Deputy Manning and Special Agent Nesbit met Thomas at a Starbucks to discuss the criminal activity that she had reported.  [Doc. 99 at 14; Doc. 105 at 98-99; Doc.

20

107 at 24, 80.]  At the meeting, Thomas stated that she was concerned about the volume of patients, which was approaching 100 to 120 patients per day, and that the results of patient testing "weren't correlated with patient care."  [Doc. 107 at 24-25.]  She described seeing patients wandering in the office, hearing employees complaining about the volume of patients and patients not seeing the doctor.  [*Id.* at 25, 47.]  During the meeting, neither Deputy Manning nor Special Agent Nesbit directed Thomas to do anything at all.  [Doc. 99 at 15; Doc. 107 at 26.]  At the end of the meeting, Deputy Manning and Special Agent Nesbit talked about possibly meeting with Thomas again in a more formal setting, and Deputy Manning gave his card to her.  [Doc. 99 at 15.]

After the meeting, Thomas exchanged text messages with Deputy Manning.  [Doc. 99 at 15; Doc. 107 at 63.]  On July 22, 2014 at 9:14 am, Thomas sent Deputy Manning a text that read:  "Chart after chart, no medical records, no X-rays, just come and pay $500 get meds" and attached a photograph of a computer screen showing electronic medical records for a patient.  (GX-1a.)  [Doc. 107 at 27-28.]  Thomas did not have any conversations with anyone at the DEA or the government about taking a picture of a patient chart and texting it to

someone.  [Doc. 107 at 67.]  Deputy Manning did not ask for Thomas to provide the information to him.  [Doc. 99 at 107.]

Two days later, on July 24, 2014 at 9:10 am, Thomas sent Deputy Manning two text messages stating:  "I believe today, tomorrow and the next Thursday and Friday will probably be the last time Dr. Tashauna [sic] Stokes will be forging scripts, he interviewed a Dr that will start in August."  (GX-1b at 1-2.)  [Doc. 107 at 29-30.]  Two minutes later, at 9:12 am, Deputy Manning responded: "Do you know the name."  (GX-1b at 3.)  [Doc. 107 at 30.]  Approximately two minutes later, at 9:14 am, Deputy Manning asked "Maybe Carlos Tan?"  (GX-1b at 4.)  According to Deputy Manning, he was familiar with Carlos Tan from other investigations and knew that Tan "worked at suspect pain clinics."  [Doc. 99 at 31-32.]  Tan's vehicle had been observed at the Clinic on one occasion, so he wanted to see if the name jogged Thomas's memory.  [Doc. 99 at 23, 32.]

At 9:16 am, Thomas replied:  "I can't be sure, I just heard him pronounce his name, he mentioned that he's a surgeon also, his CV on his desk, but they locked the door, I'll try to take a pic sometime today."  (GX-1b at 5-6.)  At 9:17 am, Deputy Manning responded:  "Nothing risky."  (GX-1b at 7.)  Deputy Manning testified that he wrote "Nothing risky" because Thomas mentioned

22

going into a locked room, and he thought that by saying "Nothing risky" he was indicating to her that she should not go into the locked office. [Doc. 99 at 32, 65-66.] Thomas replied: "OK." (GX-1b at 8.) A couple of minutes later, Thomas added: "Yeah you're right. I'll just wait, he will be here Sat at 1pm, I work every Sat, I'll find out then." (GX-1b at 9.) Deputy Manning responded "Ok." (GX-1b at 10.)

On July 25, 2014, Thomas sent Deputy Manning a photograph of Carlos Tan's CV. (GX-1c at 1.) [Doc. 99 at 28-29; Doc. 107 at 36.] The corner of the CV was chopped off the picture, so Deputy Manning called Thomas to ask her what was written in the corner of the document. [Doc. 99 at 26-27.] Thomas responded over the phone. [*Id.* at 27, 30.] He did not suggest to Thomas that she take a picture of the top right corner of the CV. [*Id.* at 69.] Then, later that day, Thomas texted a photograph of the corner of the CV. (GX-1c at 2.) [Doc. 99 at 27.] After Deputy Manning received the second photograph, he had no further interaction with Thomas. [Doc. 99 at 30].

At the time Thomas took the photograph, the CV was located on Oscar Stokes's office desk. [Doc. 107 at 37-38.] Thomas was aware that the CV was there because she had seen it earlier while she was meeting with Oscar Stokes in

23

his office and because Oscar Stokes had discussed the CV with her.  [*Id.*]  She was able to gain access to the office because the office door was open.  [*Id.* at 38.]

Special Agent Nesbit testified that they did not discuss a confidential source agreement with Thomas.  There was no need "to direct her to do anything" "sign her up," or compensate her because she was already providing information. [Doc. 105 at 100-01.]  Thomas was not deployed as a confidential source, nor was she outfitted with any recording devices.  [Doc. 105 at 101.]  The DEA did not compensate Thomas.  [Doc. 105 at 101-02, 199; Doc. 107 at 40-41.]

## 2.    Discussion

A search by a private person does not implicate the Fourth Amendment unless the person acts as an instrument or agent of the government.  *United States v. Ford*, 765 F.2d 1088, 1089-90 (11th Cir. 1985).  Courts look at two factors when determining if a private person should be regarded as a government agent: "(1) whether the government knew of and acquiesced in the intrusive conduct, and (2) whether the private actor's purpose was to assist law enforcement efforts rather than to further his own ends."  *United States v. Steiger*, 318 F.3d 1039, 1045 (11th Cir. 2003).  Oscar Stokes contends that both of these factors are met here.  With respect to the first factor, he maintains that the text messages show

24

that Deputy Manning directed Thomas's conduct.   [Doc. 110 at 17-18.] Alternatively, he argues that even if Deputy Manning did not direct Thomas's conduct, Thomas was still acting as a government agent because Deputy Manning knew that Thomas planned to take photographs, acquiesced in her decision to do so, and actively participated in the search by exchanging text messages with Thomas.  [*Id.* at 19.]  As to the second factor, Oscar Stokes argues that Thomas's actions were solely to help law enforcement, and points to Thomas's own testimony that the reason that she sent information to Deputy Manning was to provide the DEA with information to help with the investigation.  [*Id.* at 19.]

The government's response focuses only on the first factor.   The government argues that Oscar Stokes's reliance on *Steiger* is misplaced because in that case, the court held that the private actor was not a government agent.  The government goes on to argue that the facts in *Steiger* are similar to those in the case at bar.  [Doc. 118 at 15-16.]  The government does not respond to Oscar Stokes's argument that Thomas was motivated to provide information to assist law enforcement's investigation of the Clinic.

As a preliminary matter, *Steiger* is not as factually similar as the government contends.  *Steiger* involved a foreign computer hacker who had

25

infiltrated defendant Steiger's computer and discovered evidence of sexual exploitation of children.  He then contacted law enforcement and offered to provide the information.  Thus, in *Steiger*, the source of information was already in possession of the pertinent information at the time that he contacted law enforcement.  *Steiger*, 318 F.3d at 1045 ("The information conveyed . . . was limited to that which the source had acquired *before* making *any* contact with [law enforcement].").  Here, by contrast, Thomas obtained the photographs after she initially met with Deputy Manning and Special Agent Nesbit.

Because it was obvious that the source of information in *Steiger* was in possession of information before he contacted law enforcement, *Steiger* does not provide much guidance as to what constitutes knowledge or acquiesce of the government, especially where (as here) an individual obtains evidence and provides evidence after speaking with law enforcement agents.  Since *Steiger* was decided, however, the Eleventh Circuit has cited approvingly, albeit in an unpublished opinion, a Tenth Circuit opinion recognizing that the "knowledge and acquiesce" factor "encompass[es] the requirement that the government agent must affirmatively encourage, initiate or instigate the private action."  *See United States v. Emile*, 618 F. App'x 953, 955 (11th Cir. 2015) (quoting *United States v.*

*Smythe*, 84 F.3d 1240, 1243 (10th Cir. 1996)).  This follows the approach of other circuits to confront this issue.  *See, e.g., United States v. Jarrett*, 338 F.3d 339, 345 (4th Cir. 2003) ("[W]e have required evidence of more than mere knowledge and passive acquiescence by the Government before finding an agency relationship."); *United States v. Koenig*, 856 F.2d 843, 850 (7th Cir.1988) ("It is only by the exercise of some form of control that the actions of one may be attributed to another.  Mere knowledge of another's independent action does not produce vicarious responsibility absent some manifestation of consent and the ability to control." (citation omitted)); *Walther v. United States*, 652 F.2d 788, 792 (9th Cir. 1981) ("Mere governmental authorization of a particular type of private search in the absence of more active participation or encouragement is similarly insufficient to require the application of fourth amendment standards."). Thus, in considering whether a private individual is acting as a government agent, the Court should consider "whether the Government was involved directly as a participant in the search or seizure or involved indirectly by compelling or substantially encouraging the private party's actions."  *See United States v. Goldin*, No. CRIM. 95-0158-RV, 1996 WL 294366, at *13 (S.D. Ala. May 5,

1996) (citing *United States v. Miller*, 688 F.2d 652, 657 (9th Cir. 1982)), *report and recommendation adopted at* *1.[4]

Applying the foregoing standards here and viewing the totality of the circumstances, I am not persuaded that the government "knew of or acquiesced in" Thomas's actions. Although Deputy Manning was aware that Thomas was willing to provide information, neither he nor the government affirmatively encouraged her to do so. Nor can it be said that the government actively participated in her efforts to obtain information. With respect to the photograph of medical records, Thomas testified that she took the picture and sent it to Deputy Manning her own volition and that law enforcement agents did not instruct her to do so. [Doc. 107 at 34-35.] Specifically, she denied having any conversations with anyone at the DEA or the government about taking pictured of

---

[4] At the evidentiary hearing, the parties focused on the distinction between a confidential source and a source of information. For purposes of the Court's analysis, the label that the DEA uses to refer to a source is not determinative. Rather, the Court must consider the totality of the circumstances in determining whether an individual acted as an instrument or agent of the government. *See Ford*, 765 F.2d at 1090 (concluding based on "totality of the circumstances" that individual was not acting as agent of government where government had no knowledge of individual's actions and did not openly encourage or corporate with him); *see also Emile*, 618 F. App'x at 955 (same); *accord Jarrett*, 338 F.3d at 345 ("[C]ourts should look to the facts and circumstances of each case in determining when a private search is in fact a Government search.").

a patient chart and texting it to someone.  [*Id.* at 67.]  Deputy Manning similarly testified that he did not ask for Thomas to provide the information to him.  [Doc. 99 at 107.]

As for the two photographs of the Carlos Tan CV, these present a closer call because Thomas told Deputy Manning that she intended to take a picture of the CV and it was in Oscar Stokes's locked office, and Deputy Manning responded "[n]othing risky."  Those communications show that Deputy Manning was aware that Thomas intended to take a picture of the CV, that it was in an area of the office that Thomas did not have permission to enter, and that he did not make any attempt to stop her from carrying through on her planned action.  But it is also true that Deputy Manning did not affirmatively encourage Thomas to gather evidence.  At most, Deputy Manning was passive in Thomas's actions, making him much more like a witness, rather than a participant in her actions. *See Smythe*, 84 F.3d at 1243 ("[I]f a government agent is involved 'merely as a witness,' the requisite government action implicating Fourth Amendment concerns is absent.").  Thomas's testimony is consistent with the conclusion that Deputy Manning did not participate in her actions.  She testified that she took the pictures on her own volition and not because of anything the agents told her.

[Doc. 107 at 34.]  She explained that she believed that she bore the burden to provide evidence to back up what she had reported to the DEA agents, but that the agents did not ask her to provide proof of her concerns.  [Doc. 107 at 34-35.]

Oscar Stokes appears to contend that Deputy Manning should have explicitly dissuaded Thomas from gathering additional information; however, I am not convinced that he had any obligation to do so.  The government has no duty to discourage a source from obtaining information.  *See Jarrett*, 338 F.3d at 347 (holding that government had no special obligation to affirmatively discourage source from obtaining information through illicit hacking); *see also Smythe,* 84 F.3d at 1243 ("While government agents may not circumvent the Fourth Amendment by acting through private citizens, they need not discourage private citizens from doing that which is not unlawful.").

Deputy Manning's other communications with Thomas are also not sufficiently significant to show that Deputy Manning encouraged or participated in Thomas's actions.  Oscar Stokes points out that Deputy Manning initially met with Thomas to discuss the Clinic and provided her with his business card, but it appears that was nothing more than a routine police interview—hardly the sort of conduct that would transform an individual into a government agent.  Nor did

30

Deputy Manning direct Thomas to provide information concerning Tashawna Stokes or the hiring of a new doctor at the clinic. As discussed above, that was information that Thomas volunteered. [Doc. 99 at 25.] As for Deputy Manning's question to Thomas about Carlos Tan's name, Deputy Manning's question merely came in response to Thomas's statement that Oscar Stokes interviewed another physician. His question did not encourage or even suggest to Thomas that she should take pictures of the CV or that the government expected her to search for information. And with regard to Thomas's telephone call with Deputy Manning after he received the first picture of the CV, the testimony is clear that during that call, he asked her if Tan's name was on the CV—he did not instruct her to send another photograph. [Doc. 99 at 69.]

Because the government did not do anything significant to encourage Thomas to provide the photographs that are the subject of Oscar Stokes's motion to suppress, and did not actively participate in her actions, I conclude that the "knowledge and acquiescence" factor is not met under the facts of this case. *See Emile*, 618 F. App'x at 955 (private individual did not act as government agent where, among other things, law enforcement officer "did nothing significant to encourage" the search). I therefore find that Thomas was not acting as an agent

31

for the government at the time she furnished the photographs to Deputy Manning, and that Defendants' Fourth Amendment rights were therefore not violated by the search.[5]

In sum, I recommend that Oscar Stokes's motion to suppress as it relates to the photographs that Thomas provided to law enforcement be denied.

### B.     Video Recordings Made By Tameka Stokes

#### 1.     Background

In March 2014, Oscar Stokes hired Tameka Stokes to work as a medical assistant in the Clinic.  [Doc. 99 at 154.]  Her duties included greeting patients, taking blood pressure, asking patients about pain level, filling out prescriptions for the doctor to sign, and assisting Oscar Stokes with procedures.  [*Id.* at 157-58, 162.]  She also worked the telephones and manned the front desk.  [*Id.* at 162.]

When she was first hired, she would move around the Clinic to visit patients, but in July 2014, the procedure changed so that she would remain in a room and patients would come to her.  [Doc. 99 at 157-58; 166-67.]  After the change, she was assigned to the same exam room every day.  [*Id.* at 167.]

---

[5] In light of this conclusion, I need not reach the second factor—*i.e.,* whether Thomas intended to assist law enforcement efforts or to further her own ends.

Nonetheless, there was no area of the Clinic that she did not have access to, except that she would only go into the urinalysis lab room after hours to make sure that urine samples had properly been stored.  [*Id.* at 168.]  Oscar Stokes provided her with a "master key" that could unlock any door in the Clinic, except for the doors on Oscar Stokes's and Tashawna Stokes's offices.  [*Id.* at 169, 223.]

Tameka Stokes testified that she understood that Oscar Stokes did not want Clinic employees to speak to each other, and if he caught employees doing so, he would tell them to go to their rooms.  [Doc. 105 at 20-21.]

In May 2014, Tameka Stokes twice called the DEA hotline anonymously, but nothing came of either contact.  [Doc. 99 at 171.]  She then contacted local law enforcement and spoke to a detective who told her that DEA was already investigating Oscar Stokes.  [*Id.* at 171-72, 224.]  The detective stated that the DEA would want to speak with her and asked her for her telephone number, which she provided.  [*Id.* at 172.]  Special Agent Nesbit then called her.  [*Id.*; Doc. 105 at 89.]  During that first call, Special Agent Nesbit asked Tameka Stokes who she was, what her role was at the Clinic, and what motivated her to contact law enforcement.  [Doc. 99 at 172.]  She told him "everything," and he asked her if she would come to the DEA's offices to speak with them face-to-

33

face.  [*Id.* at 172-73; *see also* Doc. 105 at 89.]  She agreed, and met Special Agent Nesbit in person for a lengthy meeting.  [Doc. 99 at 173.]  He asked her questions including how long she had been at the Clinic, her job responsibilities, and whether she could "get things on recording."  [*Id.*]  She stated that she could, and agreed to wear a wire and ultimately testify if needed.  [*Id.* 173, 175.]

In June 2014, Tashawna Stokes started working at the Clinic.  [Doc. 105 at 27.]  Before then, Tameka Stokes did not interact with Tashawna Stokes.  [*Id.*]

On July 24, 2014, Tameka Stokes again met with DEA agents in advance of her wearing a recording device to the Clinic.  [Doc. 105 at 13, 54, 90.]  She was not advised about any limitations on how she could get Oscar Stokes on tape.  [Doc. 105 at 13, 15-16.]  Special Agent Nesbit testified that agents told her that she was "not going to do anything beyond what [she would] normally do."  [*Id.* at 89.]  She did not discuss with the agents how she intended to get Dr. Oscar Stokes on tape, nor did she describe her normal daily routine.  [*Id.* at 13.]  Tameka Stokes had informed the agents, however, that she had access to the treatment center, that she worked closely with Oscar Stokes, that she had access to patient files, that she wrote prescriptions, and that she had access to every part of the

34

Clinic. [*Id.* at 14-15.] She also told the agents that she would not violate the Health Insurance Portability and Accountability Act ("HIPAA"). [*Id.* at 15.]

On July 25, 2014, Tameka Stokes met with agents at a Burger King near the Clinic and was outfitted with an audio/video recording device. [Doc. 99 at 124, 175-76, 225; Doc. 105 at 93.] DEA Special Agent Geoffrey Furman instructed Tameka Stokes on how to use the device and instructed her to go into the Clinic for her normal work-day activities and attempt to record activity that appeared to be illegal. [Doc. 99 at 125, 127.] Special Agent Furman was not aware of what her regular work duties were, however. [*Id.* at 131-32.] Tameka Stokes then went to work at the Clinic. [*Id.* at 177.] She returned to work with the device two or three additional times. [*Id.*; Doc. 105 at 97.]

Tameka Stokes testified that the video she took at the Clinic was captured while she was performing her job duties. [Doc. 105 at 68-69.] For example, she took video of a patient encounter between Oscar Stokes and new patient, which she was authorized to attend. [Doc. 99 at 177-78.] Tameka Stokes was not reprimanded for engaging in unauthorized activity or behavior while making the recordings. [Doc. 105 at 70-71.]

All the patient files were maintained in a cloud-based electronic database known as AthenaNet, through which Tameka Stokes had access to individual patient files. [Doc. 99 at 158-59; Doc. 105 at 55.]

### 2. Discussion

As noted above, the Fourth Amendment does not protect against unreasonable intrusions by private individuals, unless the individual is acting as an instrument or agent of the government. *See Steiger*, 318 F.3d at 1045. With respect to Tameka Stokes, there is no dispute that she was working as an agent of the government when she surreptitiously made video recordings within the Clinic. [*See* Doc. 105 at 131.]

"In the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement." *Riley v. California*, 573U.S. __, ___, 134 S. Ct. 2473, 2482 (2014). One such exception is where the warrantless search is preceded by a valid consent. *United States v. Watkins*, 760 F.3d 1271, 1279 (11th Cir. 2014). Valid consent may be granted by a third party if the third party had either the actual authority or the apparent authority to consent to the search. *Id.* (citing *Illinois v. Rodriguez*, 497 U.S. 177, 186-89 (1990)). "A third party who has 'common authority over or other sufficient relationship to the

36

premises or effects sought to be inspected' may give valid consent to search an area." *United States v. Harris*, 526 F.3d 1334, 1339 (11th Cir. 2008) (quoting *United States v. Matlock*, 415 U.S. 164, 171 (1974)). *See generally* 4 Wayne LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 8.6(c) (5th ed.) (discussing consent searches in which the consent to search an employer's premises is given by an employee).

For consent to be valid, it must also be given freely and voluntarily. *United States v. Yeary*, 740 F.3d 569, 581 (11th Cir. 2014). Where the validity of a search rests on consent, the government has the burden of proving, by a preponderance of the evidence, that the necessary consent was obtained and that it was freely and voluntarily given. *Florida v. Royer*, 460 U.S. 491, 497 (1983); *Matlock*, 415 U.S. 164, 178 n.14 (1974). In deciding whether the government has met its burden, the court must consider the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973). The Eleventh Circuit has listed the following as relevant factors in determining voluntariness, none of which is dispositive: (1) the defendant's custodial status; (2) the presence of coercive police procedure; (3) the extent and level of the defendant's cooperation with police; (4) the defendant's awareness of his right to refuse to consent to the

search; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found. *United States v. Blake*, 888 F.2d 795, 798-99 (11th Cir. 1989).

Here, Oscar Stokes does not dispute that Tameka Stokes's consent was voluntary, and I find that the government has met its burden to show that she gave consent freely and voluntarily. She was not in custody when she agreed to make the covert recordings, there is no evidence of coercion, and she exhibited a desire to cooperate with the government's investigation. Nor was she a target of the investigation. At the time of the search, she also had obtained her GED, was a licensed medical assistant, and had previously served in the military for approximately 15 years, all of which suggest that she had requisite education and intelligence to provide consent. [Doc. 99 at 147-49.]

The issue, therefore, is whether Tameka Stokes had authority to consent to make the video recordings. Oscar Stokes maintains that at the time Tameka Stokes made the recordings, she did not have "common authority over or other sufficient relationship" to the Clinic to have consented to the search. [Doc. 110 at 12.] He points out that although Tameka Stokes testified that she had access to the "whole building," she was limited in several respects, including (1) she had

specific job duties; (2) she was not allowed to speak with other staff members or patients; (3) she was assigned to a specific exam room and waited in the room for patients to come to her; (4) she was not allowed to move freely around the clinic; (5) her key did not work on the Stokes's office doors; and (6) she was not permitted to share patient medical information with anyone under HIPAA. [*Id.* at 14.]

Oscar Stokes focuses on the restrictions on Tameka Stokes's privileges at the workplace, but the real focus should be on what responsibilities she did have and the nature of the specific events and items that she recorded.  It is fair to say that she did not have unbridled access to every area of the premises or business records; however, the video recordings she did make were of things and events that fell well within the scope of her employment.  Focusing on the four videos played at the evidentiary hearing, I am convinced that Tameka Stokes had requisite authority to consent to the video recordings.

The first video, identified as clip 133312 on GX-2, Depicts Tameka Stokes handing a prescription that she filled out to Tashawna Stokes, who signs the prescriptions with Oscar Stokes's initials.  [Doc. 99 at 180-83.]  Tameka Stokes testified that her duties at the clinic included filling out prescriptions for patients

and then getting Oscar or Tashawna Stokes to sign the prescription.  [*Id.* at 158.]
Thus, Tameka Stokes had sufficient control over the prescriptions to enable her to
grant consent to videotape her practice of presenting prescriptions to Tashawna
Stokes for signature.

The second video, identified as clip 110223 on GX-4, purports to show
records indicating that insured patients were not being seen by a physician prior
to a prescription being written.  [Doc. 99 at 187.]  The video also purports to
show Tameka Stokes handing the prescriptions that she filled out to Oscar Stokes,
who signed them.  [*Id.* at 188.]  Again, Tameka Stokes had access to prescriptions
and obtained the signatures of Oscar or Tashawna Stokes as part of her routine
duties.

The third video, identified as clip 113859 on GX-4, depicts a new patient
intake appointment that Tameka Stokes and Oscar Stokes attended.  [Doc. 99 at
188.]  Tameka Stokes testified that it was not out of the ordinary for her to attend
new patient visits with Oscar Stokes.  [*Id.*]

The fourth video, identified as clip 114850 on GX-4, shows paperwork that
was completed in connection with the intake appointment recorded in the third
clip.  [Doc. 99 at 190.]  The clip purports to show that the patient identified

40

medications on the intake paperwork, and that Oscar Stokes prescribed all the medications that the patient identified.  Tameka Stokes testified that she had access to that paperwork as part of her job responsibilities.  [*Id.*]

The bottom line is that each of the foregoing videos shows things and events that Tameka Stokes had ready access to and control over in the ordinary scope of her employment at the Clinic.  I have also reviewed the other videos on GX 2, 3 and 4, and conclude that those videos similarly show things within the scope of her employment at the Clinic.  I am therefore not persuaded that there was anything captured on video that fell outside her job responsibilities.

### 3.    Effect of Federal and State Privacy Laws

Oscar Stokes also argues that both Thomas's and Tameka Stokes's searches violated federal and state privacy laws.   [Doc. 110 at 21-22.] Specifically, he contends that the searches violated (1) O.C.G.A. § 16-11-62(2), which criminalizes acts of eavesdropping and surveillance, including photographing and recording activities of another that occur in a private place and out of private view; and (2) 42 U.S.C. § 1320d-6(a), which imposes criminal penalties for disclosing confidential medical records in violation of HIPAA. [Doc. 30 at 3-5; Doc. 47 at 4-5; Doc. 110 at 21-22.]  Oscar Stokes contends that

41

these alleged violations warrant suppression of the photographs and videos, or at a minimum, impact the reasonableness of the searches, since law enforcement must have known that the warrantless searches would violate federal law.  [Doc. 110 at 22.]

With respect to Cheryl Thomas, the record shows that the government did not encourage or actively participate in her taking of photographs--*i.e.*, the conduct that Oscar Stokes contends to be illegal.  "Evidence secured by private searches, even if illegal, need not be excluded from a criminal trial."  *Jarrett*, 338 F.3d at 344 (quotation marks omitted); *see also Steiger*, 318 F.3d at 1045-46 (rejecting argument that suppression was required because agent did not advise judge who issued the warrant that the information had been obtained by computer hacking).  Accordingly, even if Thomas's conduct violated federal or state law, that would not provide a sufficient basis for suppression.

As for Tameka Stokes, given her role as an agent of the government, I am not persuaded that she violated state surveillance law or HIPAA.  O.C.G.A. § 16-11-62(2)(D) expressly exempts law enforcement agents who use a device in performance of official duties to "to observe, photograph, videotape, or record the activities of persons that occur in the presence of such officer or his or her agent."

42

Similarly, HIPAA permits [a] "covered entity" to "disclose to a law enforcement official protected health information that the covered entity believes in good faith constitutes evidence of criminal conduct that occurred on the premises of the covered entity." 45 C.F.R. § 164.512(f)(5).

In sum, I am not persuaded that these privacy laws require suppression under the circumstances of this case.

### 4.      Summary

Based on the foregoing, I conclude that neither the photographs that Thomas provided to law enforcement nor the videos that Tameka Stokes recorded at the Clinic should be suppressed. Accordingly, I **RECOMMEND** that Oscar Stokes's Motion to Suppress Evidence Obtained by the Government's Source of Information [Doc. 30] be **DENIED**.

## III.   Conclusion

For the foregoing reasons, I **RECOMMEND** that the following motions be **DENIED**:   (1) Oscar Stokes's Motion to Suppress Evidence and for Return of Seized Property [Doc. 24]; (2) Oscar Stokes's Motion to Suppress Evidence Obtained by the Government's Source of Information [Doc. 30]; and (3)

Tashawna Stokes's Motion to Suppress Evidence Seized Pursuant to Two Constitutionally Deficient Warrants [Doc. 82].[6]

IT IS SO RECOMMENDED this 23rd day of June, 2017.

_____
JOHN K. LARKINS III
United States Magistrate Judge

_____

[6] This case is not yet ready to be certified ready for trial.  Defendants have moved preliminarily to exclude the opinion testimony of the government's expert witnesses, and that motion is not yet ripe for resolution.  [*See* Doc. 126.]  Also, as noted above, on June 22, 2017, Oscar Stokes advised that he intends to file an additional motion for the return of funds that the government seized, based on recent changes in the law.  [*Id*.]  Those matters are distinct from those currently pending before the Court.