IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>OSCAR JAMESON STOKES, M.D.<br>and TASHAWNA DENISE STOKES,<br>M.D. | CRIMINAL ACTION FILE NO.<br><br>1:14-CR-290-TWT-JKL |

## ORDER AND FINAL REPORT AND RECOMMENDATION

Defendants Oscar Jamison Stokes, M.D. and TaShawna Denise Stokes, M.D. are charged in this case with conspiracy to distribute and dispense controlled substances, maintaining a place for drug distribution, illegal distribution of controlled substances, and money laundering of the proceeds of the distribution scheme.  [*See* Doc. 55.]

Pending before the Court is Defendant TaShawna Stokes's Motion for a Bill of Particulars [Doc. 193], and Defendants' Joint Motion to Exclude the Proposed Expert Testimony of Dr. Theodore Parran [Doc. 191 ("Motion to Exclude")].  The Court has also conducted an *in camera* review of a Veterans Affairs Office of Inspector General investigative report pertaining Dr. Parran's rotation of doctoral

fellows from a Department of Veterans Affairs ("VA") fellowship outside of the VA over a decade ago, to determine whether the report contains *Brady* or *Giglio* material that must be disclosed to Defendants. [*See* Docs. 202-04.] For the reasons that follow, Defendant TaShawna Stokes's Motion for a Bill of Particulars is **DENIED**; the undersigned **RECOMMENDS** that Defendants' Motion to Exclude be **GRANTED IN PART** and **DENIED IN PART**; and the undersigned has concluded that the investigative report need not be disclosed pursuant to *Brady* or *Giglio*.

## I.    TASHAWNA STOKES'S MOTION FOR A BILL OF PARTICULARS

### A.    Background

On August 6, 2014, a federal grand jury returned an indictment against Defendant Oscar Jameson Stokes ("Dr. Jameson Stokes"), charging him with conspiracy to distribute, outside the usual course of professional medical practice and for no legitimate medical purpose, controlled substances at his pain clinic, Innovative Pain Management Clinic (the "Clinic"), as well as with substantive distribution counts. [*See* Doc. 1.] Approximately eleven months later, on July 7, 2015, the government obtained a twenty-one count superseding indictment, adding Defendant TaShawna Denise Stokes ("Dr. TaShawna Stokes"), Dr. Stokes's wife, as a co-defendant. [Doc. 55.]

2

The superseding and now operative indictment alleges that Dr. Jameson Stokes prescribed controlled substances on Clinic patients' first and subsequent visits without appropriate medical examination, in inappropriate amounts, dosages, and/or combinations, and not for legitimate medical purposes; that Dr. Jameson Stokes and the Clinic prescribed controlled substances even after learning the drugs were being diverted by patients to other individuals; and that the Clinic serviced an inordinately large amount of patients. [*Id.* ¶ 14-15.] It also asserts that Dr. TaShawna Stokes worked at the Clinic; acted as the primary Clinic physician when Dr. Jameson Stokes was not present; issued prescriptions by forging Dr. Jameson Stokes's signature; prescribed controlled substances without conducting medical examinations, in inappropriate amounts or dosages, and not for legitimate medical purposes; and allowed patients to change their medications and/or increase their dosages without any further examinations. [*Id.* ¶ 16.]

The superseding indictment specifically charges Dr. TaShawna Stokes in sixteen separate counts:

- Count One charges both Defendants with conspiracy to distribute and dispense controlled substances in violation of 21 U.S.C. § 846;

3

- Counts Five through Ten charge both Defendants with illicitly prescribing oxycodone, a Schedule II substance, to a patient identified as "C.F.," outside the scope of professional practice and not for a legitimate medical purpose, on five separate dates from April through August 2014, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C);[1]

- Counts Eleven through Fourteen charge both Defendants with illicitly prescribing Dilaudid, MS Contin, or Oxycodone, all of which are Schedule II substances, to a patient identified as "J.R.," outside the scope of professional practice and not for a legitimate medical purpose, on four separate dates from May through August 2014;

- Count Fifteen charges both Defendants with illicitly prescribing oxycodone to a patient identified as "S.M.," outside the scope of professional practice and not for a legitimate medical purpose, on May 6, 2014;

---

[1] Counts Two through Four charge Dr. Jameson Stokes with using the Clinic to illicitly prescribing Schedule II substances to patients outside the scope of professional practice and not for a legitimate medical purpose, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C), and 21 U.S.C. § 856(a)(1).

4

- Count Sixteen charges both Defendants with illicitly prescribing Dilaudid and Opana ER, also a Schedule II controlled substance, to a patient identified as "B.B.," outside the scope of professional practice and not for a legitimate medical purpose, on May 20, 2014;

- Count Seventeen charges both Defendants with conspiracy to violate 18 U.S.C. § 1956, the federal money laundering statute, alleging that Defendants acquired money from illegally prescribing and distributing controlled substances to operate the Clinic, fund salaries of Clinic employees, pay off loans used to purchase Clinic equipment, and to lease space for future medical offices; and

- Counts Twenty and Twenty-One charge Dr. TaShawna Stokes with two substantive violations of the money laundering statute by depositing funds that were the proceeds of the unlawful distribution of controlled substances on February 18, 2014 and February 21, 2014.[2]

---

[2] Counts Eighteen and Nineteen charge Dr. Jameson Stokes alone with two substantive violations of the money laundering statute by depositing funds that were the proceeds of the unlawful distribution of controlled substances.

[*Id.* ¶¶ 10-35.]  Importantly for present purposes, Counts Five, Six, Seven, Eleven, Fifteen, and Sixteen are substantive charges against both Defendants, alleging that they illicitly prescribed controlled substances outside the scope of professional practice and not for a legitimate medical purpose in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C).  [*Id.* ¶¶ 21-28.]  Those six counts all pertain to prescriptions made prior to June 2014 (hereinafter, the "Pre-June Counts").  [*Id.*]

In relation to Dr. TaShawna Stokes's Motion for Severance [Doc. 160], Dr. Jameson Stokes submitted a declaration stating that, if the Defendants' cases were severed at trial, he would offered testimony that Dr. TaShawna Stokes (1) "had no physical presence or involvement with [the Clinic] until around mid-June 2014"; (2) had no involvement with the alleged prescriptions identified in the Pre-June Counts, as each of those prescriptions predate June 2014, and were written before she came to work at the Clinic; and (3) did not see the patients listed in those Counts on the dates in question, issue the prescriptions referenced in those Counts, or otherwise have any involvement with those Counts' alleged prescriptions.  [Doc. 160-1 (Decl. of Oscar Jameson Stokes) ¶¶ 12-15.]

In opposing the motion to sever, the government argued, *inter alia*, that Dr. TaShawna Stokes cannot show that there is a bona fide need for the testimony of

her husband because (1) she could establish similar exculpatory testimony through other witnesses, namely former employees of the Clinic;[3] (2) multiple witnesses will testify concerning her involvement (or lack thereof) at the Clinic; and (3) Dr. TaShawna Stokes was observed on a covert video signing prescriptions for patients she never examined.  [Doc. 166 at 6-8.]

Since the superseding indictment was filed, three years have passed; this Court has conducted several days' worth of evidentiary hearings; and according to Dr. TaShawna Stokes, a "substantial volume of discovery" has been provided by the government.  [*See* Doc. 193 at 3-4.]  Despite this, Dr. TaShawna Stokes now complains that the government has not provided any information to support its case with respect to the Pre-June Counts; and that she and her counsel "literally ha[ve] no idea what [she] did to either issue or aid and abet in the issuance of the prescriptions set forth in the counts."  [*Id.*]  In her motion and reply in support, Dr. TaShawna Stokes argues that since she did not affirmatively write the prescriptions

---

[3] The government did affirmatively argue that Dr. TaShawna Stokes was involved in the practice prior to June 2014 through by her deposits of alleged tainted Clinic funds into bank accounts in February 2014.   [Doc. 166 at 10.] However, that pertains to Counts Twenty and Twenty-One, in which Dr. TaShawna Stokes is alleged to have deposited the illicit proceeds from the Clinic into her bank account in violation of 18 U.S.C. § 1957.  [Doc. 55 ¶¶ 34-35.]

at issue, the government must be proceeding against her on the Pre-June Counts based upon a theory of aiding and abetting; however, there is no relevant information in the indictment about any conduct she allegedly engaged in the furtherance of purported illicit prescriptions.  [*Id.* at 5-8; *see also* Doc. 200 at 2-5.] As a result, Dr. TaShawna Stokes contends that she has no way prepare an effective defense at trial against the Pre-June Counts, and asks that the Court order the government to provide a bill of particulars that includes additional information about the actions she is alleged to have taken in relation to those Counts.  [*Id.*]

The government has responded in opposition, arguing that Dr. TaShawna Stokes has sufficient information, based upon the details in the superseding indictment and discovery provided by the government, to prepare her defense, and that she is not entitled to additional information that amounts to a "'road map to the government's case.'"  [Doc. 199 at 3-6 (quoting *United States v. Leiva-Portillo*, No. 1:06-CR-350-WSD-LTW, 2007 WL 1706351, at *14 (N.D. Ga. June 12, 2007)).]

### B.    Discussion

Rule 7(f) of the Federal Rules of Criminal Procedure provides that the Court "may direct the government to file a bill of particulars."  Fed. R. Crim. P. 7(f).  The purpose of a bill of particulars is "to inform the defendant of the charge against

h[er] with sufficient precision to allow h[er] to prepare h[er] defense, to minimize surprise at trial, and to enable h[er] to plead double jeopardy in the event of a later prosecution for the same offense." *United States v. Cole*, 755 F.2d 748, 760 (11th Cir. 1985). A bill of particulars thus supplements an indictment by providing the defendant with information necessary for trial preparation. *United States v. Reddy*, No. 1:09-CR-0483-ODE-AJB, 2010 WL 3210842, at *5 (N.D. Ga. Apr. 5, 2010), *report and recommendation adopted as modified*, 2010 WL 3211029, at *1 (N.D. Ga. Aug. 11, 2010) (citing *United States v. Anderson*, 799 F.2d 1438, 1441 (11th Cir. 1986)). General discovery is not a valid reason for seeking a bill of particulars, *United States v. Colson*, 662 F.2d 1389, 1391 (11th Cir. 1981), nor is it "'designed to compel the government to [provide a] detailed exposition of its evidence or to explain the legal theories upon which it intends to rely at trial,'" *United States v. Roberts*, 174 F. App'x 475, 477 (11th Cir. 2006) (quoting *United States v. Burgin*, 621 F.2d 1352, 1359 (5th Cir. 1980)).

"The defendant bears the burden of showing that the information requested is necessary and that [s]he will be prejudiced without it so as to justify granting a bill of particulars," and as a result, the "mere statement that the defendant will be prejudiced . . . is insufficient." *Reddy*, 2010 WL 3210842, at *5 (citing *United*

*States v. Barnes*, 158 F.3d 662, 666 (2d Cir. 1998)); *see also United States v. Blitch*, No. CRIM.A.508-CR-40(HL), 2009 WL 973359, at *5 (M.D. Ga. Apr. 9, 2009) (citing *United States v. Thevis*, 474 F. Supp. 117, 124 (N.D. Ga. 1979)).  The grant or denial of a bill of particulars rests within the sound discretion of the trial court. *United States v. Draine*, 811 F.2d 1419, 1421 (11th Cir. 1987); *Colson*, 662 F.2d at 1391.

As an initial matter, the present motion is untimely.  "The defendant may move for a bill of particulars before or within 14 days after arraignment or at a later time if the court permits."  Fed. R. Crim. P. 7(f).  Dr. TaShawna Stokes was arraigned on July 16, 2015.  [Doc. 63.]  Her motion was not filed until years later, and does not address any reason for the delay, much less offer any "'factual circumstances to indicate good cause for extending the 14-day limit of Rule 7(f).'" *United States v. Hinton*, No. 5:13-CR-32 (MTT), 2014 WL 12690115, at *3 (M.D. Ga. Apr. 15, 2014) (quoting *United States v. McKay*, 70 F. Supp. 2d 208, 211 (E.D.N.Y. 1999)).

Even if the motion were timely, she would still not be entitled to a bill of particulars.  Dr. TaShawna Stokes argues that "in light of the Government['s] concession" that before June 2014, she "'did not work at [the] clinic, visit [the]

clinic regularly or have anything to do with the operation of [the] clinic," it must explain and/or disclose evidence regarding any actions she allegedly took in furtherance of the Pre-June Counts.  [Doc. 193 at 78 (citing Doc. 166 at 6).]  This argument, however, depends on a misapprehension of the government's prior position.  In opposing the motion to sever, the government did not concede that Dr. TaShawna Stokes had no involvement with the Clinic practice prior to June 2014; rather, it stated simply that the testimony that Dr. Jameson Stokes proposed to offer (if their trials were severed) regarding her lack of involvement **_could be_** elicited from other Clinic employees:

> [Dr. TaShawna Stokes] cannot show a bona fide need for the testimony of her husband.  The Government's evidence against [her] will come in the form of, *inter alia*, testimony of multiple witnesses and hidden camera footage.  Further, and more importantly, **_the heart of the desired testimony_** – that [Dr. TaShawna Stokes] did not work at clinic, visit clinic regularly, or have anything to do with operation of clinic, (before June 2014) – **_can be_** elicited from any number of [Clinic] employees.

[Doc. 166 (emphasis added); *see also id.* at 8 ("those employees **could** testify").] In other words, the government merely stated that there was no bona fide need for Dr. Jameson Stokes's testimony because other Clinic employees would be able to testify about the same subject matter—the level of Dr. TaShawna Stokes's involvement in the Clinic practice before June 2014—but did not concede that she

was not involved in the Clinic before June 2014 or that Clinic employees would in fact offer exculpatory testimony in relation to that time period.

Because the government has not made such a concession, the Court concludes that the government has presented sufficient information in the superseding indictment for Dr. TaShawna Stokes to prepare her defense.  It clearly alleges that she worked at the Clinic; acted as the primary Clinic physician when Dr. Jameson Stokes was not present; issued prescriptions by forging Dr. Jameson Stokes's signature; and made illicit prescriptions without examining patients.  [*Id.* ¶ 16.]  The Pre-June Counts, in turn, relate to specific prescriptions of controlled substances that were allegedly made by Dr. Jameson Stokes and/or Dr. TaShawna Stokes; and the Counts specify the patients to whom alleged illicit prescriptions were made (by initials), the date the prescriptions were made, and the type, dosage, and amounts of drugs prescribed.  [*Id.* ¶¶ 10-28.]  As such, Dr. TaShawna Stokes is in possession of the nature of the criminal conduct the government has alleged, and can mount a defense against them.  *See United States v. Kunzman*, 54 F.3d 1522, 1526 (10th Cir. 1995) (bill of particulars is not necessary when indictment is sufficiently specific and the defendant has access to the government's discovery).

What Dr. TaShawna Stokes seeks now is the evidence the government has in support of the charges against her, which is not appropriate in a bill of particulars. "'[T]here is a difference between being surprised by the charge and being surprised by the evidence supporting a charge. The function of the bill of particulars is to reduce surprise at the *charge*, that is, to enable the defendant to identify what he is alleged to have done in violation of law. It is not to eliminate surprise with respect to evidence offered in support of a charge that is clearly understood by the defendant.'" *United States v. Slawson*, No. 1:14-CR-00186-RWS, 2014 WL 5804191, at *13 (N.D. Ga. Nov. 7, 2014) (quoting *United States v. Scrushy*, 2004 WL 483264, at *9 n.5 (N.D. Ala. March 3, 2004)), *report and recommendation adopted*, 2014 WL 6990307 (N.D. Ga. Dec. 10, 2014). That Dr. TaShawna Stokes is able to specifically identify the conduct at issue and argue that there is insufficient evidence for the government to prove its case actually undermines her supposed need for more detail and belies that her request is one for evidentiary discovery. *See United States v. Garcia*, No. 1:05-CR-2541-WSD-AJB, 2015 WL 13734644, at *3 (N.D. Ga. Nov. 17, 2015) ("Defendant seeks evidentiary detail about the conspiracy charge, information that is not obtainable through a bill of particulars. His statement that he is not seeking evidentiary detail is belied by his

13

contention that 'there [is no] evidence to establish how the single substantive act alleged to have occurred in 2002 was in furtherance of the conspiracy involving the 2004 substantive acts.'").  Indeed, "[i]n a case where the evidence being sought by a bill of particulars consists of activities in which a defendant participated or witnessed, the defendant 'could hardly have been surprised by the government's proof at trial.'"  *United States v. Slawson*, No. 1:14-CR-00186-RWS, 2014 WL 5804191, at *14 (N.D. Ga. Nov. 7, 2014) (quoting *United States v. Cantu*, 557 F.2d 1173, 1178 (5th Cir. 1977)), *report and recommendation adopted*, 2014 WL 6990307 (N.D. Ga. Dec. 10, 2014); *see also United States v. Williams*, 113 F.R.D. 177, 179 (M.D. Fla. 1986) (if information sought in bill of particulars involves "events in which one or more of the defendants participated, or which occurred in one or more of the defendants' presence[, t]he Eleventh Circuit has held that this sort of information need not be furnished in a bill of particulars.") (citing *Cole*, 755 F.2d at 760-61)).  Accordingly, Dr. TaShawna Stokes's Motion for a Bill of Particulars is **DENIED**.

## II.    DEFENDANTS' MOTION TO EXCLUDE

Separately, Defendants move to exclude the testimony of the government's proposed expert witness in this case, Dr. Theodore V. Parran, M.D. ("Dr. Parran"). [Doc. 191.]

### A.    Background

Dr. Parran's testimony has been the subject of dispute for multiple years.  In January 2016, the Court held a status conference and directed the government to provide its Rule 16 expert disclosures in advance of an evidentiary hearing scheduled for May 13, 2016.  [Doc. 88.]  On May 11, 2016, the government emailed a five-page letter report to defense counsel indicating that the government intended to use Dr. Parran as an expert at trial.  [*See* Doc. 192-1; *see also* Doc. 167-1.]  In this initial report, the government first provided background information about Dr. Parran, along with his curriculum vitae, which noted that Dr. Parran:

- received his medical degree from Case Western Reserve University ("CWRU") in 1982, where he is now a professor and chair of Medical Education;

- is board-certified by the American Board of Internal Medicine;

- is certified in Addiction Medicine by the American Society of Addiction Medicine;

- has worked as an Addiction Medical Consultant at the University Hospitals of Cleveland since 1994; and

- serves as Medical Director for three treatment and detoxification centers in Cleveland.

[*Id.* at 1-2.]  The report indicated that Dr. Parran would rely on various medical community standards for pain diagnosis and treatment, including but not limited to

15

the Federal of State Medical Boards model guidelines, the Georgia Composite

Medical Board guidelines, and standards set under Georgia law.  [*Id.* at 2.]  Dr.

Parran would then apply those standards, using his training and experience, in his

review of patient files and other records from the Clinic, to offer his opinions about

the care provided to the Clinic patients.  [*Id.*]

The May 13, 2016 letter report then provided an overview of Dr. Parran's

proposed testimony, stating that he would testify, among other things, that:

> prescribing physicians and other medical personnel at the
> Clinic, particularly Drs. [Jameson] & TaShawna Stokes,
> ***exhibited a pattern of behavior that was a concerning
> departure from the standard of care*** expected of
> licensed physicians in the United States and Georgia and
> that was dangerous to the health and safety of the Clinic's
> patients.  Dr. Parran concludes that ***there are many cases
> where the prescribing of controlled drugs by Dr.
> [Jameson] Stokes appears to have been for other than
> legitimate medical purpose and appears not to have
> taken place within the usual course of medical practice***.

[Doc. 192-1 at 2 (emphasis added).]  Based upon introduction, it appeared that Dr.

Parran would testify about both the pattern of prescribing at the Clinic as well as

instances in which specific drugs prescribed by Dr. Jameson Stokes were not for

legitimate medical purposes and/or not within the course of medical practice.

The letter report went on to explain that in his review, Dr. Parran evaluated

regular patient charts and undercover patient materials, and concluded that Dr.

16

Jameson Stokes's prescribing practices fell below the medical standard of care because he (1) failed to perform any substantial physical exam on any undercover patient; (2) falsely documented that he had performed such exams; (3) never physically saw, interviewed, or examined any undercover patients at any visit other than at their initial visits; (4) violated principles of safe prescribing practices by ignoring urine toxicology reports, continuing to prescribe drugs despite clear evidence that patients were seeing other doctors for controlled drug prescriptions, not taking medications as directed, and/or not taking prescribed medications at all; and (5) displayed a "remarkable pattern" of allowing members of the same family to obtain the same or similar prescriptions of controlled medications without checking the available State Prescription Monitoring Program reports on those patients.  [*Id.* at 2-5.]  At the conclusion of the report, the government advised that "Dr. Parran expects he may amend his report and supplement his opinions regarding those prescribing practices."  [*Id.* at 5.]

Approximately a year later, in May 2017, counsel for Dr. TaShawna Stokes requested a status conference to discuss, among other things, "[i]ssues concerning the Government's Rule 16 expert summary."  [Doc. 123 at 1.]  The Court granted the request for a conference and set a hearing for June 22, 2017.  [Doc. 125.]  In

advance of the hearing, the government provided defense counsel with a supplemental report, which indicated that Dr. Parran had reviewed 50 additional patient files, purportedly selected at random. At the June 22 conference, the Court expressed its unease about the pace of the government's expert analysis and disclosures, especially since it appeared to take Dr. Parran weeks or months to review a relatively small number of patient files. Accordingly, the Court ordered the government to complete its expert witness's analysis and opinions, along with its concomitant Rule 16 disclosures, within 90 days; and gave defense counsel 21 days following the expert disclosure to perfect any motion to exclude. The government was unable to meet that 90-day deadline, and the Court granted two extensions for the government to complete the analysis—ultimately making December 4, 2017, the deadline to produce its expert disclosure. [Docs. 142, 151, 152.]

On December 4, 2017, the government provided defense counsel with a 29-page supplement prepared by Dr. Parran, which updated his biographical information and reflected his findings with respect to more than 100 Clinic patients. [*See* Doc. 192-2; *see also* Doc. 167-2.] In addition to information outlined in the

initial letter report, the December 4, 2017 report explained that Dr. Parran's experience included:

- performing research and writing educational materials about addiction, controlled drug prescribing, and pain management;

- serving as a consultant to various pain management programs;

- presenting educational sessions on pain management, controlled drug and opioid prescribing, and addiction issues throughout the country;

- directing a nationally disseminated conference on "Prescribing Opioids for Chronic Pain: Balancing Safety and Efficacy," which was supported by federal grant funding;

- directing for two decades widely acclaimed remedial education courses for physicians identified as having problems with their controlled drug prescribing; and

- testifying in many legal cases.

[Doc. 192-2 at 1.]

More substantively, according the supplemental report, Dr. Parran had reviewed patient files in batches, and provided his findings as to those batches starting on June 30, 2015. [Doc. 192-2.] In the portion of the supplemental report reflecting his findings as of June 30, 2015, Dr. Parran stated that:

> After reviewing regular patient charts and undercover patient materials, my findings, to within a reasonable degree of medical certainty are that ***there are many cases***

> ***where the prescribing of controlled drugs by Dr. Stokes***
> ***appears to have been for other than legitimate medical***
> ***purpose and appears not to have taken place within the***
> ***usual course of medical practice***. In fact the prescribing
> of controlled drugs as evidenced in these records, by Dr.
> Stokes is quite alarming.

[Doc. 192-2 at 1.]   Dr. Parran again outlined his "general concerns and issues
identified during chart and undercover visit material review." [*Id.* at 1-4.] He then
identified and discussed specific records from undercover office visits and patient
files. [*Id.* at 4-19.] In particular, Dr. Parran discussed four undercover office visits
and 46 patient files selected by the government. [*Id.* 4-19.] In each instance, Dr.
Parran summarized the treatment and prescribing history and explained that the
course of treatment endangered the health and safety of the patient, was
inconsistent with the usual course of medical practice, and/or was for other than
legitimate medical purpose. [*Id.*]

He thereafter attached a "Report Addendum," dated May 18, 2016, in which
he identified 50 "randomly selected patient files." [*Id.* at 19-21.] For purposes of
the addendum, Dr. Parran explained:

> ***This [supplemental] review was not to form an opinion***
> ***to within a reasonable degree of medical certainty about***
> ***the prescribing of controlled drugs by Dr. Stokes to***
> ***these additional patients, but rather to identify whether***
> ***or not the same patterns of prescribing deficiencies***
> ***appear to be present in the randomly selected files.  In***

> ***other words to see if similar patterns of prescribing*** that
> deviate from the usual course of medical practice are in
> BOTH randomly selected files and in the original files
> reviewed in detail [on pages 6-19 of the initial report].

[*Id.* at 19 (emphasis added).]  He then noted the names of the randomly selected patients, along with a brief one- or two-line statement regarding type of deficiencies he identified, largely by reference to other statements made previously about the prescribing problems he had generally outlined.   [*Id.* at 19-21.]   Thus, the addendum again suggested that Dr. Parran would offer testimony about the pattern of prescribing at the Clinic, in addition to the specific instances in which drugs were prescribed for other than legitimate purposes.

Following the report addendum pertaining to the randomly selected patient files, Dr. Parran supplemented his early review of patient files with a review of 15 additional patient files, completed between September 2017 and November 1, 2017, [Doc. 192-2 at 21-25], as well as a review of another 20 additional patient files, completed between October 31 and December 3, 2017, [*id.* at 25-29].  Those reviews followed the same procedure used in the June 30, 2015 review of the four undercover patients and 46 patients selected by the government (versus the more cursory review of the "randomly selected" patient files in the report addendum). [*Id.* at 21-29.]  According to those summaries completed between September and

21

December 2017, with the exception of four patient files with respect to which he indicated "no opinion," Dr. Parran again concluded that to within a reasonable degree of medical certainty, the prescribing of controlled drugs was done in a manner that endangered the health and safety of the patients, was inconsistent with the usual course of medical practice, and was for other than a legitimate medical purpose.  [*Id.*]

Notably, the reports provided by the government did not disclose Dr. Parran's methodology for "randomly" selecting the additional patient files for review.  [Doc. 192-2.]  In December 2017, counsel for Dr. TaShawna Stokes asked the government for detail concerning how patient files were "randomly" selected, as well as for confirmation that the report was the final report the government intended to produce.  [Doc. 161-1 at 5.]  The government responded that Dr. Parran used a random number generator to select the 50 additional patient files for review (the patient files identified on pages 19-21 of the December 4 report).  [Doc. 161-1 at 4.]  The government indicated that it selected the other patient files for review, though it did not clarify whether it selected the files merely for the initial review completed in May 2015 or for both the initial review and the additional review completed between September and December 2017.  [*Id.*]  Defense counsel asked

for more detail about the "random" selection, and in response, the government stated that Dr. Parran in fact had not used a random number generator to select the patient files, but rather "literally opened patient files at random and reviewed their contents." [*Id.* at 2-3.] Counsel for Dr. TaShawna Stokes responded, seeking both (1) an explanation for the discrepancy between the government's responses concerning Dr. Parran's method for selecting the 50 patient records at random and (2) a copy of the database from which the "random" selection was conducted. [*Id.* at 1.]

On February 2, 2018, Defendants moved the Court to (1) restrict the government from further expanding the testimony that Dr. Parran intends to offer, and (2) either exclude Dr. Parran's testimony regarding the 50 patient records that he selected at random in the report addendum because the government had not produced evidence sufficient to show how Dr. Parran selected the patient files, or alternatively, compel the production of additional information regarding the selection process. [Docs. 161, 162.]

Following briefing and oral argument, on April 18, 2018, the Court issued its order pertaining to Dr. Parran's testimony. [Doc. 175.] First, the Court directed the government to supplement Dr. Parran's report no later than 45 days before trial,

and to limit any supplementation to the files of patients whom the government intends to call as witnesses at trial and/or reference in its case-in-chief; and the government was warned that its failure to meet the deadline could result in exclusion of undisclosed opinion evidence under Rule 16.  [*Id.* at 12-15.]  Second, because the government stated during oral argument that it would (1) provide the source of the patient files from which Dr. Parran made his random selection, (2) specifically address the database format from which Dr. Parran made his selection, and (3) provide access to the database(s) utilized by Dr. Parran,[4] the Court denied as moot Defendants' request for additional information.  [*Id.* at 16-17.]  Finally, while the Court denied Defendants' challenge to Dr. Parran's testimony—based upon inadequate disclosures under Rule 16—it allowed that a *Daubert* challenge could be made.  [*Id.* at 18-22.]

Importantly for present purposes, the Court made two additional observations.  First, with regard to Dr. Parran's particularized review of individual

---

[4] Defendants indicate in their Motion to Exclude that access to the relevant databases should have been granted by July 20, 2018, [*see* Doc. 191 at 4 n.2], and have not subsequently suggested on reply or elsewhere that such access has been withheld.

24

patient files and his subsequent individualized assessments of the prescriptions at

issue, the Court stated:

> [E]xpert testimony is regularly admitted to show that prescriptions
> were not issued for a legitimate medical purpose and that defendants
> acted outside the scope of usual practice; and testifying experts—
> typically medical experts such as Dr. Parran—review the patient files
> in light of the standards medical professions generally hold
> themselves to.  *See, e.g. United States v. Chube*, 538 F.3d 693, 697
> (7th Cir. 2008); *United States v. McIver*, 470 F.3d 550, 556 (4th Cir.
> 2006); *United States v. Katz*, 445 F.3d 1023, 1032 (8th Cir. 2006);
> *United States v. Feingold*, 454 F.3d 1001, 1007 (9th Cir. 2006);
> *United States v. Varma*, 691 F.2d 460 (10th Cir. 1982).   The
> methodology used by Dr. Parran in his review of Clinic patient files
> (including those randomly selected), then, appears consistent with
> that of medical experts testifying in criminal cases . . . .

[*Id.* at 21.]   Second, the Court expressed concern regarding the scope of Dr.

Parran's expert testimony, and whether he would "offer testimony regarding the

general prevalence at the Clinic practice of prescriptions made without legitimate

medical purpose and/or outside the scope of usual practice . . . ."   [*Id.* at 23.]

Because the government had made conflicting statements about whether Dr.

Parran's testimony would be used to establish a pattern or otherwise present

statistical analysis, the Court warned:

> If the government seeks to have Dr. Parran offer testimony about
> Defendants' prescribing practices as it pertains to patients whose files
> he has not specifically reviewed, he will be extrapolating at least in
> part from his "random" review, and the government is obligated to

25

> make Rule 16 disclosures relative to such proffered testimony,
> including sufficient insight into basis of the selection criteria allowing
> the Defendants to frame their defense, whether by way of a *Daubert*
> challenge, cross-examination, or rebuttal.

[*Id.* at 23-24 (citing Fed. R. Crim. P. 16, Adv. Comm. Notes, 1993 Am.; *United States v. Holland*, 223 F. App'x 891, 894 (11th Cir. 2007); *United States v. Noe*, 821 F.2d 604, 607 (11th Cir. 1987)).]  The government appears not to have made any further disclosure pursuant to this directive.

The Court also set an initial briefing schedule for *Daubert* challenges to Dr. Parran's testimony.  [Doc. 174.]  Following extensions [Docs. 183, 185], the Court set a final briefing schedule and ordered that Defendants be provided with a duplicate of all materials pertaining to the Clinic's patient files that were accessible to the government [Doc. 186].  Defendants filed their present Motion to Exclude on July 20, 2018.  [Doc. 191.]  The government has responded in opposition [Doc. 192], and Defendants' deadline for filing a reply has expired.

## B.    The Parties' Arguments

In their Motion to Exclude, Defendants argue that Dr. Parran's testimony should be excluded for multiple reasons.  [Doc. 191.]  First, echoing their prior arguments, Defendants contend that the government's Rule 16 disclosures inadequately summarize the methodology and standards Dr. Parran utilized in

forming his opinions, and that his testimony should be barred outright as a result. [*Id.* at 12-16.]   Second, Defendants argue that the conclusions set forth in Dr. Parran's reports are not sufficiently reliable because Dr. Parran has not described any objective methodology applied and his opinions have "no foundation whatsoever . . . other than what appears to be his own personal experience as a physician"; as a result, Defendants argue, Dr. Parran's testimony should be excluded as unreliable under *Daubert* and Rule 702 of the Federal Rules of Evidence.   [*Id.* at 16-22.]   Separately, Defendants argue that Dr. Parran should be prohibited from offering expert testimony on prescribing patterns based upon his review of the "randomly selected" patient files, or otherwise offering expert testimony of a statistical nature, given the lack of disclosures regarding any sampling methodologies.   [*Id.* at 24-26.]

The government responds first, that the government's expert disclosures pertaining to Dr. Parran comply with requirements of Rule 16; and second, that Dr. Parran's opinions about specific drug prescriptions are sufficiently reliable under *Daubert* and Rule 702, since the methodology employed by Dr. Parran to reach his conclusions—relying on medical texts and guidelines generally accepted in the medical community, as well as his own experience as medical practitioner—has

regularly be held to satisfy the requirements set forth under *Daubert* and Rule 702. [Doc. 192 at 5-2.]  The government, however, does not respond in opposition to Defendants' arguments that Dr. Parran's opinions regarding prescribing patterns or practices at the Clinic should be excluded.  [*See generally*, Doc. 192.]

### C.    Discussion

#### 1.    Sufficiency of the Government's Rule 16 Disclosures

Federal Rule of Criminal Procedure 16 requires the government to provide a defendant, upon request, with a written summary of any expert testimony it intends to use in its case-in-chief at trial.  Fed. R. Crim. P. 16(a)(1)(G).  The summary "must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications."  *Id.*  The commentary further provides that "the government is required to provide a criminal defendant with . . . 'any information that might be recognized as a legitimate basis for an opinion . . . .'"  *Holland*, 223 F. App'x at 894 (quoting Fed. R. Crim. P. 16, Adv. Comm. Notes, 1993 Am.).  The purpose of the rule is "to minimize surprise that often results from unexpected expert testimony, reduce the need for continuances, and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination," Fed. R. Crim. P. 16, Adv. Comm. Notes, 1993 Am., as well as

to more generally "permit [] complete trial preparation," *id.*, and to protect a defendant's right to a fair trial, *Noe*, 821 F.2d at 607.

While Rule 16 requires expert disclosures to "describe . . . the bases and reasons for th[e expert's] opinions," Fed. R. Crim. P. 16(b)(1)(G), the expert disclosure requirement is "not intended to create unreasonable procedural hurdles," Fed. R. Crim. P. 16, Adv. Comm. Notes, 1993 Am., and courts in this District have stated that the government is not required to disclose every "a comprehensive recitation of every nuance and detail that will make up an expert's testimony, or which may be drawn out on cross-examination." *United States v. Campbell*, No. 1:04-CV-0424-RWS, 2006 WL 346446, at *1 (N.D. Ga. Feb. 13, 2006) (finding the government's disclosure of an expert forensic document examiner sufficient based on a four-page summary of testimony and a twelve-page, single-spaced report describing credentials, opinions, and overview of the expert's process and reasoning). The required quantity and specificity of an expert disclosure summary vary based upon the context and the complexity of a matter about which an expert intends to testify. *See United States v. Lamonda*, No. 6:05CR131ORL19KRS, 2006 WL 843823, at *1 (M.D. Fla. Mar. 29, 2006) (citing *United States v. Jackson*,

51 F.3d 646, 651 (7th Cir. 1995) and *United States v. Mehta*, 236 F. Supp. 2d 150, 155 (D. Mass. 2002)).

Although a court may preclude expert testimony that it determines was not properly disclosed, *see* Fed. R. Crim. P. 16(d)(2), if an expert disclosure ultimately meets the threshold requirements of Rule 16—providing a summary of the expert's testimony that includes a description of the opinion and its bases and reasons—the decision to exclude the expert's testimony is more properly made following a *Daubert* challenge that tests the actual reliability of the testimony.  *See United States v. DSD Shipping, A.S.*, No. CR 15-00102-CG-B, 2015 WL 5737157, at *2 (S.D. Ala. Sept. 30, 2015); *see also United States v. Rich*, 326 F. Supp. 2d 670, 677 (E.D. Pa. 2004) ("Although expert testimony must meet the standards set forth in *Daubert* and its progeny, there is no authority for defendant's proposition that expert reports, submitted pursuant to Rule 16(a), must independently meet those requirements.  Rather, if counsel believes that proposed expert testimony is unreliable, counsel can request a *Daubert* hearing.").

In this case, as it pertains to Dr. Parran's review of individual patient files and his subsequent assessments of specific drugs prescribed at the Clinic, the Rule 16 reports provided by the government are sufficient.  [*See* Docs. 192-1, 192-2.]

30

First, they carefully outline Dr. Parran's experience as a doctor in internal medicine; medical educator; and specialist in pain management, prescription of controlled substances, and addiction.  [Doc. 192-1 at 1-2; Doc. 192-2 at 1.]  The reports indicate that based upon his knowledge and experience, and relying on at least three different standards accepted in the medical community, he reviewed of patient files and other records from the Clinic, to offer his opinions about the whether the drugs prescribed by the Defendants were made for legitimate medical purposes and/or within the scope of usual medical practice.  [*Id.*]  The reports then consist of approximately four pages of "general concerns" about problems Dr. Parran identified in his review [Doc. 192-1 at 2-5; Doc. 192-2 at 2-4], along with 25 pages of single-spaced analyses of whether and why specific prescriptions to individual patients were for legitimate medical purposes and/or consistent with the usual course of medical practice, [Doc. 192-2 at 4-29].

As this Court previously noted, expert testimony is regularly admitted in criminal cases to show that specific drug prescriptions were not issued for a legitimate medical purpose and that defendants acted outside the scope of usual practice; and testifying experts—typically medical experts such as Dr. Parran— review the patient files and prescriptions in light of the standards medical

31

professions generally hold themselves to.  *See, e.g. Chube*, 538 F.3d at 697; *McIver*, 470 F.3d at 556; *Katz*, 445 F.3d at 1032; *Feingold*, 454 F.3d at 1007; *Varma*, 691 F.2d at 460.[5]  The background, experience, and methodology used by Dr. Parran in his review of Clinic patient files, then, appears consistent with that of medical experts testifying in criminal cases, and Defendants have failed to demonstrate that the bases or reasoning behind any of the specific opinions were not sufficiently

---

[5] Defendants argue that this is an unusually complex case that requires more robust disclosures.  [Doc. 191 at 12-14.]  The cases cited by Defendants are not on point.  First and most importantly, none of the cited cases addresses expert testimony relating to the propriety of drug prescriptions, and as discussed, the methodology outlined by Dr. Parran is consistent with those utilized in similar cases.  Second, the only cases finding disclosures insufficient under Rule 16 related to highly specialized areas of chemical or physical science analysis, involving methodologies that would need to be replicated or tested with exacting precision. *See United States v. Davis*, 514 F.3d 596, 612 (6th Cir. 2008) (chemist's report did not include any description of methods used to identify substance); *United States v. DSD Shipping*, A.S., No. CR 15-00102-CG-B, 2015 WL 5737157, at *1 (S.D. Ala. Sept. 30, 2015) (no summary of gas chromatography-mass spectrometry methodology for oil sample analysis); *United States v. Cordoba*, No. 12-20157-CR, 2012 WL 3614319, at *3 (S.D. Fla. Aug. 21, 2012) (no actual opinion offered regarding distances that a Lear jet may fly while loaded with varying weights).  In less technical cases, disclosures have largely been held to be insufficient only when they amount to nothing more than a list of general topics about which the expert would testify. *See e.g., United States v. Concessi*, 38 F. App'x 866, 868 (4th Cir. 2002) (healthcare fraud); *United States v. Ferguson*, No. 3:06CR137 (CFD), 2007 WL 4539646, at *1 (D. Conn. Dec. 14, 2007) (legal ethics); *United States v. Mahaffy*, No. 05 Cr. 613(ILG), 2007 WL 1213738, at *3 (E.D.N.Y. Apr. 24, 2007) (security fraud).

disclosed.  Defendants' request to exclude Dr. Parran's testimony about specific drug prescriptions at the Clinic should therefore be **DENIED**.

To the contrary, as it pertains to any pattern of prescribing at the Clinic or an extrapolation regarding the same based upon the files reviewed by Dr. Parran, neither Dr. Parran's reports, nor any disclosure by the government, appear to explain to defense counsel or the Court precisely how patient files were selected for review, much less how any "random" sampling of patient files would allow Dr. Parran to render any statistically meaningful opinion pertaining to unreviewed patient files.  Indeed, as previously discussed, the government has not only given incomplete or vague responses, it has given information that was flat-out wrong.

Moreover, since providing the Rule 16 reports regarding Dr. Parran's testimony, the government has repeatedly disclaimed that he would offer testimony of a statistical nature.  First, upon direct questioning from the Court during the April 12, 2018 hearing, the government maintained that Dr. Parran's "random" review of patient files would not be used to offer testimony regarding the general prevalence at the Clinic of prescriptions made without legitimate medical purpose and/or outside the scope of usual practice; as the government warranted: "To be clear, there is no statistical analysis—meaning we're going to determine [or]

extrapolate a percentage of patients that were illegally prescribed medications." The government's position, according to counsel, is that the general prevalence "does not matter," because the charges against Defendants are based upon specific instances in which prescriptions of controlled substances were allegedly made without legitimate medical purpose or outside the scope of usual practice.[6]  Second, the government appears not to have made any further disclosure pursuant to this Court's directive it would be "obligated to make Rule 16 disclosures relative to such [statistical] testimony, including sufficient insight into basis of the selection criteria allowing the Defendants to frame their defense."  [Doc. 175 at 24.]  Third and finally, the government has not responded in opposition to Defendants' argument that Dr. Parran should be prohibited from offering testimony regarding prescribing patterns at the Clinic based upon a statistical extrapolation from his review of "randomly selected" patient files.

In any event, because the government has not offered any meaningful disclosures regarding the bases or methodology for Dr. Parran's statements about

---

[6] As government counsel put it, even if Defendants had properly prescribed medication to 90 out of 100 patients, they could still be convicted based upon their improper prescription of medication to the remaining 10.  Because of this, counsel argued, the general practice is not pertinent to the charges made against Defendants.

general prescribing practices at the Clinic—that is, as it pertains to prescriptions made to Clinic patients whose files Dr. Parran has not specifically reviewed—Defendants' motion to exclude such testimony by Dr. Parran should be **GRANTED**.  Fed. R. Crim. P. 16(b)(1)(G); *Holland*, 223 F. App'x at 894; *Noe*, 821 F.2d at 607.  Based upon the government's Rule 16 disclosure, Dr. Parran's testimony should be limited to only those Clinic patients whose filed he reviewed, and any testimony based upon extrapolation from "randomly selected" patient files should be excluded.[7]

### 2.   Reliability under Rule 702

The admissibility of an expert's testimony is controlled by Rule 702 of the Federal Rules of Evidence, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:  (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable

---

[7] Although Defendants appear to frame the issue as one of reliability under Rule 702 [*see* Doc. 191 at 25], the Court believes there is a threshold problem in the government's disclosures under Rule 16, in that there has been no meaningful disclosure of a methodology that would allow the Court to make an assessment of reliability under Rule 702 or for Defendants to frame a *Daubert* challenge.  As Defendants properly note, the government simply provided "no information" at all. [*See id.*]

principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

"In determining the admissibility of expert testimony under Rule 702, district courts must consider whether the expert can testify competently on the areas he intends to discuss, whether the expert's methodology is sufficiently reliable, and whether the expert's testimony, through the application of his scientific, technical, or specialized expertise, will assist the trier of fact to understand the evidence." *United States v. Jayyousi*, 657 F.3d 1085, 1106 (11th Cir. 2011) (citing *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998)); *see also United States v. Frazier,* 387 F.3d 1244, 1260 (11th Cir. 2004). "Importantly, although there is some overlap among the inquiries into an expert's qualifications, the reliability of his proffered opinion and the helpfulness of that opinion, these are distinct concepts that courts and litigants must take care not to conflate." *Quiet Tech. DC-8, Inc. v. Hurel-Dubois, UK, Ltd.*, 326 F.3d 1333, 1341 (11th Cir.2003); *see Frazier,* 387 F.3d at 1260. Moreover, "'[a] district court cannot simply accept that an opinion is reliable because the expert says that his methodology is sound.'" *United States v. Azmat*, 805 F.3d 1018, 1041-42 (11th Cir. 2015) (quoting *Hughes v. Kia Motors Corp.*, 766 F.3d 1317, 1331 (11th Cir. 2014)). "If admissibility could be established merely by the *ipse dixit* of an admittedly qualified expert, the

reliability prong would be, for all practical purposes, subsumed by the qualification prong." *Frazier*, 387 F.3d at 1261.

In this case, Defendants attack the reliability prong. Specifically, they contend that Dr. Parran's opinions are not sufficiently reliable because he has not described how any objective methodology was applied. [Doc. 191 at 18-22.] Defendants argue that in order to meet Rule 702's reliability requirements, there must be an explanation tying specific provisions of objective guidelines or standards to the conclusions Dr. Parran draws about the medical purpose or legitimacy of specific prescriptions, but that as presented in his reports, Dr. Parran's conclusions appear based entirely on personal experience.

Although the Eleventh Circuit has approved of more exacting indicia of reliability,[8] the Court is satisfied that Dr. Parran's reports provide a sufficient foundation of reliability given the decisions by the Eleventh Circuit and other District Courts in similar cases. In particular, in *United States v. Clark*, a so-called

---

[8] In *United States v. Roland*, the Circuit affirmed the district court's admission of expert testimony in a so-called "pill mill" case when the expert physician summarized guidelines contained in sources generally accepted by the medical community, created a rubric for analyzing prescribing practices in relation to the guidelines, and then individually compared patient files to the rubric to demonstrate when the defendant failed to adhere to the guidelines' standards. 737 F. App'x 484, 499-50 (11th Cir. 2018)

"pill mill" case, the district court initially found an expert's proposed testimony insufficient reliable because the expert disclosure "d[id] not outline what is the appropriate standard of care [or] how [the expert] determined these were the standards," and the government stated only that the expert had "relied on his or her experience and possibly standard reference material."  No. CR413-28, 2013 WL 6842746, at *2 (S.D. Ga. Dec. 27, 2013), *aff'd sub nom United States v. Azmat*, 805 F.3d 1018, 1040 (11th Cir. 2015).  After the district court ordered a supplement from the government, the government provided:

> a memorandum describing the numerous sources that [the expert] relied on in reaching the conclusions presented in his expert worksheets.  These sources included federal and state medical guidelines, literature from national organizations, published journal articles, and textbooks.  In addition, the government explained [the expert]'s method of reviewing patient files, which involved [] weighing [the defendant]'s decisions against the standards articulated in the above medical texts and [the expert] exercising his judgment as an experienced medical practitioner to reach conclusions concerning the legitimacy of [the defendant]'s courses of treatment.

*Azmat*, 805 F.3d at 1042.  The district court then denied the defendant's pre-trial *Daubert* motion, and the Eleventh Circuit affirmed, holding that the denial "easily passed scrutiny."  *Id.*  The expert's methodology:

> determin[ing] the appropriate standards of care for a pain management practice by relying on his nine years of practice in pain management, a review of academic and professional medical

38

literature relating to pain management and prescription drug treatment, and the criteria outlined in professional practice and professional guidelines used for the state of Georgia,

was found sufficiently reliable by the district court and affirmed by the Eleventh Circuit. *Id.* at 1040-1042. Moreover, having grounded his testimony in medical texts and guidelines, the expert's opinions and methodology did not become unreliable simply because they did not specifically discuss how each of the prescribing decision failed to comply with specific medical guidelines or federal or state regulations. *Id.* at 1042-43.

The methodology described in Dr. Parran's reports—at least as it pertains to patients whose files were reviewed and summarized in detail by Dr. Parran—aligns suitably with the expert methodology described in *Azmat*. As in that case, Dr. Parran's methodology was based upon his decades of experience in pain management, prescription of controlled drugs, and addiction treatment; his reliance on medical community standards for pain diagnosis and treatment, such as the Federation of State Medical Boards model guidelines, the Georgia Composite Medical Board guidelines, and standards reflected by Georgia law; and his review of Clinic patient files, weighing the prescribing decisions against the standards articulated in the guidelines and exercising his judgment as an experienced medical

39

practitioner to reach conclusions concerning the legitimacy of the selected courses of drug treatment. That the reports could have done more to articulate the specific model guideline provisions or other rules and regulations applicable to each prescription analysis[9] goes less to the reliability of the methodology and the admissibility of his expert testimony, and more to the credibility and weight of the testimony. *See United States v. Caroni*, No. 3:10CR101/MCR, 2011 WL 4102331, at \*4 (N.D. Fla. Sept. 13, 2011) ("The fact that Dr. Parran does not reference the rules and regulations promulgated [under the particular rules] has no bearing on the admissibility of his testimony. The applicable standard of care in this case is the 'standard of medical practice generally recognized and accepted in the United States,' and . . . the fact that Dr. Parran does not reference the standard of care . . . does not render his opinions irrelevant or unreliable.") (quoting *United States v. Merrill*, 513 F.3d 1293, 1306 (11th Cir. 2008)); *accord United States v. Boccone*, 556 F. App'x 215, 226 (4th Cir. 2014) (recognizing that "there is no requirement . . . that the expert must . . . set forth a particular model policy or standard, or cite to particular records or amounts of records for any particular patient" and that those points bear on the weight of the testimony). Accordingly, Defendant's motion to

---

[9] *See Roland*, 737 F. App'x at 499-50.

exclude Dr. Parran's testimony should be **DENIED** with regard to the Clinic patients whose files were reviewed and summarized in detail by Dr. Parran.

As it pertains to the 50 patients "randomly selected" by Dr. Parran, however, the reports provide no discussion of Dr. Parran's review, no explanation regarding why any prescribing decision fell outside any applicable guidelines or standard of care, nor any account of how Dr. Parran exercised his judgment to conclude that they exhibited patterns of prescribing practices that deviate from the usual course of medical practice. Indeed, Dr. Parran disavowed that the "random" review was even medically reliable, stating:

> This review was not to form an opinion to within a reasonable degree of medical certainty about the prescribing of controlled drugs by Dr. Stokes to these additional patients, but rather to identify whether or not the same patterns of prescribing deficiencies appear to be present in the randomly selected files.

[Doc. 192-2 at 19.]

Without any explanation of the Dr. Parran's review process, and given his affirmative disclaimer of medical certainty, the government cannot demonstrate that the methodology utilized by Dr. Parran in his review of the 50 "random" patient files was reliable. *See Clark*, 2013 WL 6842746, at *3 ("If the witness is relying solely or primarily on experience, then the witness must explain how that

41

experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.") (quoting *United States v. Pacheco*, No. 08-20895-CR, 2009 WL383257 (S.D. Fla.  Feb. 14, 2009)).  Because the government has failed to present the methodology by which Dr. Parran developed his opinions regarding the 50 randomly selected patients, Defendant's motion to exclude should be **GRANTED** with regard to his opinions concerning those patients' treatment.

Finally, the Court notes that *Daubert* hearings are not required before a judge may admit expert testimony.  *See United States v. Hansen*, 262 F.3d 1217, 1234 (11th Cir. 2001) ("*Daubert* hearings are not required, but may be helpful in 'complicated cases involving multiple expert witnesses.'") (citing *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998)); *United States v. Majors*, 196 F.3d 1206, 1215 (11th Cir. 1999) (finding that the district court did not abuse its discretion by admitting expert testimony without the benefit of a *Daubert* hearing), *cert. denied*, 529 U.S. 1137 (2000); *City of Tuscaloosa*, 158 F.3d at 564 n.21 (concluding that, while complicated cases involving multiple expert witnesses may benefit from a *Daubert* hearing, such hearings are not required by law or by the procedural rules); Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence*, § 702.02[6][a] (Joseph M. McLaughlin, ed.,

Matthew Bender 2d ed. 2006) (noting that it is within the trial judge's discretion whether to hold an admissibility hearing).   In light of the findings and recommendations above regarding the sufficiently of the government's expert disclosures under Rule 16, and Dr. Parran's qualifications and methodology under Rule 702, the Court concludes that it need not conduct a *Daubert* hearing at the present time.

## III.   INVESTIGATIVE REPORT

On October 5, 2018, Defendants' moved for the *in camera* inspection of potential *Brady* [10] and/or *Giglio* [11] material regarding Dr. Parran—namely, an investigative report that federal law enforcement prepared in the 2007-2009 time period regarding Dr. Parran's use of VA fellows outside of VA facilities.  [*See* Doc. 202; *see also* Doc. 203.]  Of particular concern to Defendants was the possibility that Dr. Parran fraudulently billed the VA, and that the investigative report contained evidence impeaching Dr. Parran's credibility; showed payments to or an agreement with Dr. Parran that would suggest bias.  [Doc. 202 at 6-8.]  The Court

---

[10] *Brady v. Maryland*, 373 U.S. 83 (1963).

[11] *Giglio v. United States*, 405 U.S. 150 (1972).

43

granted the motion for *in camera* review.   [Doc. 204.]   That review is now complete.

It is well-established that there is no general constitutional right to discovery in criminal proceedings.  *See, e.g., Weatherford v. Bursey*, 429 U.S. 545, 559 (1977).  In *Brady*, however, the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  373 U.S. at 85-86.  Subsequently, in *Giglio*, 405 U.S. 150, and *United States v. Bagley*, 473 U.S. 667 (1985), the Supreme Court held that a prosecutor's *Brady* obligations encompass impeaching, as well as exculpatory, evidence to the extent it is material to the impeachment of a prosecution witness.  "[E]vidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'"  *Kyles v. Whitley*, 514 U.S. 419, 433 (1995) (quoting *Bagley*, 473 U.S. at 782).  The prosecution's duty to disclose exculpatory and impeaching evidence, however, does not extend so far as to require the disclosure of neutral,

44

irrelevant, or speculative evidence.  *United States v. Lindsey*, 482 F.3d 1285 (11th Cir. 2007).

The investigative report in this case need not be disclosed, as it does not contain *Brady* or *Giglio* material.  With respect Defendant's specific concerns, there were no findings that Dr. Parran committed billing fraud or was untruthful, and the report contains no evidence of payments, agreements, or deals reached between Dr. Parran and the government, except for the rather obvious fact that he has been paid for services rendered to VA patients and for consulting services as an expert witness in federal criminal cases.[12]  Because the report does not contain material, impeaching evidence pertaining to Dr. Parran, much less information tending to exculpate Defendants, the undersigned declines to order that the government disclose the investigative report.

## IV.   CONCLUSION

For the foregoing reasons, the undersigned **DENIES** Defendant TaShawna Stokes's Motion for a Bill of Particulars and **RECOMMENDS** that Defendants'

---

[12] Dr. Parran's work with the VA was previously disclosed by way of Dr. Parran's curriculum vitae.  [*See* Doc. 167-3 at 3-14.]  The Court presumes the government's current fee arrangement for Dr. Parran's work as an expert in this case has been or will be disclosed.

Motion to Exclude **GRANTED IN PART** and **DENIED IN PART**.  Dr. Parran's expert testimony regarding the Clinic patient files and prescriptions reviewed around June 30, 2015 (pertaining to the four undercover office visits and 46 patient files selected by the government for review), as well as those reviewed between September and December 2017 (pertaining to two batches of 15 and 20 additional patient files), should be **ALLOWED**.  Expert testimony by Dr. Parran pertaining to general prescribing practices at the Clinic or the legitimacy of prescriptions contained in "randomly selected" patient files contained in the May 18, 2016 report addendum (or in any other patient file that has not been reviewed and disclosed above), should be **EXCLUDED**.  Finally, undersigned has concluded that the investigative report relating to Dr. Parran need not be disclosed pursuant to *Brady* or *Giglio*.

There are no additional matters pending before the undersigned, and I have not been advised of any impediments to the scheduling of a trial.  Accordingly, this matter is **CERTIFIED READY FOR TRIAL**.

IT IS SO ORDERED AND RECOMMENDED this 19th day of October, 2018.

JOHN K. LARKINS III
United States Magistrate Judge